UNITED STATES of America, Appellee,

v.

Roberto REINER RAMOS, Appellant.

UNITED STATES of America, Appellee,

v.

Elsa CARIDAO GONZALEZ, Appellant.

Nos. 86–5389, 86–5390.

United States Court of Appeals,
Eighth Circuit.

Submitted March 10, 1987.

Decided May 18, 1987.

Rehearing and Rehearing En Banc
Denied July 15, 1987.

Phillip S. Resnick, Minneapolis, Minn. and Carl H. Lida, Miami, Fla., for appellants.

Joseph T. Walbran, Asst. U.S. Atty., Minneapolis, Minn., for appellee.

Before LAY, Chief Judge, JOHN R. GIBSON, Circuit Judge, and HANSON,* Senior District Judge.

* The HONORABLE WILLIAM C. HANSON, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

JOHN R. GIBSON, Circuit Judge.

Roberto Ramos and Elsa Gonzalez appeal their joint convictions of possession of cocaine with intent distribute in violation of 21 U.S.C. § 841(a)(1) (1982) and of conspiracy to distribute cocaine in violation of 21 U.S.C. § 846 (1982). The sole error they urge for reversal is the district court's [1] refusal to suppress approximately four pounds of cocaine seized pursuant to their warrantless arrests. Ramos and Gonzalez contend that the arresting officers lacked probable cause because the information provided to the police by the principal informant was sketchy and uncorroborated. We affirm the judgments of conviction.

As Ramos and Gonzalez challenge the adequacy of the information possessed by the police before their arrests, we will relate that information in some detail. In the fall of 1985, Officer Gerard Bohlig of the St. Paul Police Department assisted in the investigation of a cocaine distribution organization in the Minneapolis-St. Paul area headed by one Magda Llovet. Llovet was convicted and imprisoned at the Ramsey County Adult Detention Center. In November 1985, Bohlig received a tip from a confidential informant, referred to in the record as Informant No. 1, that Llovet was still conducting her cocaine operation from jail. Informant No. 1 spoke with Bohlig by telephone or in person about twice a week from November until the arrests of Ramos and Gonzalez in March 1986. He told Bohlig that he had personal knowledge that Llovet carried on her operation with the assistance of one Manuela Flores and a man named Ramos. Flores, according to the informant, was the liaison between Llovet, Ramos, and various other members of the organization. Informant No. 1 also gave Bohlig Flores' telephone number. Bohlig checked the Ramsey prison vistor records and confirmed that an individual named Flores regularly visited Llovet during this time period. Flores' telephone

1. The Honorable Donald D. Alsop, Chief Judge, United States District Court for the District of Minnesota.

number was also confirmed independently by another informant.

Informant No. 1 told Bohlig that Ramos brought four- to six-pound quantities of cocaine to St. Paul from Miami, Florida on quick turn-around flights about every two weeks. He described Ramos to Bohlig as being short, about 45 years old, light-skinned, and Hispanic. He said that Ramos did not speak English. He also said that Ramos traveled with a female companion and that when Ramos was in the Minneapolis-St. Paul area, he stayed at either the Holiday Inn near the State Capitol Building or at the Quality Inn near the St. Paul Civic Center. Informant No. 1 told Bohlig that he had seen Ramos in a hotel in St. Paul with cocaine and customers present.

At the time Bohlig was talking with Informant No. 1, Sergeant Freichels of the St. Paul Police Department was told by another confidential informant, who had in the past provided information which led to a number of arrests and convictions and to the seizure of large quantities of cocaine, that Magda Llovet was continuing her cocaine distribution operation from jail. Informant No. 2 also told Freichels that Llovet was working through an individual named "Manuela." He gave Freichels the same telephone number for "Manuela" as Informant No. 1 had given Bohlig for Manuela Flores.

On March 3, 1986, Informant No. 1 told Bohlig that Ramos and his female companion were at the Holiday Inn near the State Capitol Building, in Room 510. By the time the police arrived, Ramos and his companion had departed. A search of Room 510 turned up two discarded airline boarding passes and tickets showing a March 2, 1986 flight from Miami to Minneapolis-St. Paul by Mr. Roberto Ramos and Mrs. Elsa Ramos.

Immediately thereafter, Bohlig's superior, Lieutenant Dugan, contacted an employee at the Minneapolis-St. Paul Airport, and asked that this individual alert the police if Roberto Ramos purchased a ticket from Miami to Minneapolis-St. Paul. This citizen informant had provided Dugan with information in the past, and Dugan considered him reliable. On March 28, this informant reported that Ramos and Mrs. Coridao Gonzalez were traveling together on Northwest Flight 719 to Minneapolis-St. Paul. Airline employees verified their presence on the plane and described Ramos as a light-skinned Hispanic, short, in his 40's, and wearing a dark suit. His companion was described as a middle-aged woman with reddish hair wearing slacks and a floral print blouse. The two were scheduled to return to Miami on March 30.

Bohlig and one of his fellow officers waited at the arrival gate and observed the passengers departing from Flight 719. Only two passengers matched the descriptions of Ramos and Gonzalez, and Bohlig followed them from the gate to the baggage area, where they retrieved a suitcase, and then to the taxi stand, where they hired a cab. Bohlig followed their cab, supported by approximately five additional police cars and ten officers. The police stopped the cab as it entered St. Paul on Chestnut Street, which leads to the area of the Holiday Capitol Inn and Quality Inn identified by Informant No. 1. Evidently, some of the officers had their guns drawn at the time the police pulled over the cab.

A deputy sheriff patted Ramos down after Ramos climbed out of the cab. He testified at the suppression hearing that he felt a solid object around Ramos' torso which he thought could be a form of nonmetallic body armor. The deputy opened Ramos' shirt and discovered an elastic girdle-type sheath. The sheath had a number of sewn-in compartments containing packages of a white powdered substance that proved on later analysis to be cocaine. Additional packets of white powder were discovered strapped to each ankle.

Gonzalez was also patted down. The police discovered a similar girdle-type sheath containing packets of cocaine around her waist. Additional packets of cocaine were found about her ankles. In all, the police seized about four pounds of cocaine from Ramos and Gonzalez.

Before trial, Ramos and Gonzalez moved to suppress the cocaine, contending as they do here that the police lacked probable

cause to stop the cab and arrest them. Both the magistrate [2] and the district court on *de novo* review of the suppression hearing record and the magistrate's report and recommendation determined that the arrest was supported by adequate probable cause. *See United States v. Ramos*, 3–86–CR–51, slip op. at 7 (D.Minn. July 25, 1986) (denying motion to suppress evidence). Ramos and Gonzalez were convicted, after a bench-trial on stipulated facts, of possession of cocaine with intent to distribute and of conspiracy to distribute cocaine. Ramos was sentenced to two concurrent five-year terms of imprisonment; Gonzalez was sentenced to two concurrent one-year terms of imprisonment. This appeal followed.

We review the district court's finding of probable cause to make the warrantless arrest of Ramos and Gonzalez under the clearly erroneous standard. *United States v. Wajda*, 810 F.2d 754, 758 (8th Cir.1987); *United States v. Eisenberg*, 807 F.2d 1446, 1449 (8th Cir.1986). Under this standard, a finding is clearly erroneous if we, upon review of the entire record, are left with the definite and firm conviction that a mistake has been committed, or if we conclude that the district court's determination is not supported by substantial record evidence or reflects an erroneous view of the applicable law. *Eisenberg*, 807 F.2d at 1450; *United States v. Flett*, 806 F.2d 823, 826 (8th Cir. 1986). "Probable cause exists to make a warrantless arrest when, at the moment of the arrest, the collective knowledge of the officers involved, was 'sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.'" *Wajda*, 810 F.2d at 758 (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)); *see also United States v. McGauley*, 786 F.2d

888, 890 (8th Cir.1986); *United States v. Bubis*, 744 F.2d 61, 64 (8th Cir.1984). "The determination of whether probable cause exists must not rest on isolated facts; rather it depends on the cumulative effect of the facts in the totality of the circumstances." *Bubis*, 744 F.2d at 64 (quoting *United States v. Everroad*, 704 F.2d 403, 406 (8th Cir.1983)); *see also Eisenberg*, 807 F.2d at 1451 (applying "totality of the circumstances" analysis to warrantless arrest). "This is a 'practical, commonsense,' and 'nontechnical' determination." *United States v. Briley*, 726 F.2d 1301, 1306 n. 3 (8th Cir.1984) (quoting *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983)).

Ramos and Gonzalez argue that the information given the police by Informant No. 1 is too sketchy and indeterminate to "warrant a prudent man in believing," *Beck*, 379 U.S. at 91, 85 S.Ct. at 225, that they would be carrying cocaine to St. Paul on March 28, 1986. They also argue that the information provided by Informant No. 2 and the citizen informant added nothing to the credibility or veracity of Informant No. 1's assertions. They contend, moreover, that the police confirmed only a few innocent, insignificant details of Informant No. 1's tip. Thus, they argue, the collective knowledge and information of the officers making the arrests did not rise to the level of that approved by the Supreme Court in *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), and in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Rather, it is analogous to the information the Supreme Court held to be insufficient to support probable cause in *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).[3]

---

2. The Honorable Janice M. Symchych, United States Magistrate for the District of Minnesota.

3. Ramos and Gonzalez also argue that the police did not have enough information or knowledge to support a valid *Terry*-type investigative stop, and that in any event the circumstances under which the police initially stopped them—the presence of six or seven police cars and a dozen police officers, many with drawn weapons—amounted to a full-blown arrest, citing our decision in *United States v. Pajari*, 715 F.2d 1378

(8th Cir.1983). We have recently considered at length the question of whether a *Terry* stop becomes an arrest under analogous circumstances to those presented here. *See United States v. Jones*, 759 F.2d 633 (8th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985). Because we conclude that the officers had probable cause to arrest Ramos and Gonzalez, we need not determine whether *Jones* is sufficiently analogous to govern our decision here. Certainly, however, if probable cause ex-

The district court found that the initial stop of Ramos and Gonzalez was "based upon more than adequate probable cause." *Ramos,* slip op. at 5. In arriving at this conclusion, the court noted that some of the information provided by Informant No. 1—the continuation of Llovet's drug operation while in jail and the first name and phone number of Flores—was corroborated by Informant No. 2. Further corroboration came from the police investigation of Informant No. 1's tip that Ramos and his traveling companion were at the Holiday Inn on March 3, 1986; the police verified that Ramos stayed at that hotel, traveled with a female companion, and made quick, turn-around flights from Miami to Minneapolis-St. Paul. Finally, the police were able to verify Informant No. 1's physical description of Ramos when he and Gonzalez arrived at the Minneapolis-St. Paul airport under Bohlig's observation. The court found that the interlocking details of the information given the police, considered in light of the corroboration of some of these details by police investigation, provided "more than an abundance of probable cause to believe [Ramos and Gonzalez] were engaged in criminal conduct at the time of the stop on March 28, 1986." *Id.,* slip op. at 6.

We agree with the district court's conclusion. This case is unlike *Florida v. Royer, supra.* In *Royer,* the defendant was initially stopped because his appearance and actions fit the "drug courier profile," *i.e.,* he appeared to be nervous, he paid for his ticket with cash, he was traveling to a "target" city, he was carrying apparently heavy bags, and he filled out the luggage identification tags with only a name and a destination, rather than an address and telephone number. *Royer,* 460 U.S. at 493 n. 2, 507, 103 S.Ct. at 1322 n. 2, 1329. The agents who stopped Royer had no prior information that he would be carrying drugs, or in fact any information about him at all. He simply looked suspicious. Ramos, on the other hand, was not simply singled out by police at the airport on the basis of his appearance and behavior.[4] Bohlig had a tip that Ramos and Gonzalez would be carrying cocaine when they came to St. Paul. Some details of this tip had been confirmed by police investigation and corroborated by another informant. This is certainly more information tending to "warrant a prudent man in believing," *Beck,* 379 U.S. at 91, 85 S.Ct. at 225, that an offense was being committed than the information the arresting officers possessed in *Royer.* Thus, we reject the argument that this case is governed by *Royer.*

We likewise reject the argument that *Draper* and *Gates* compel us to reverse the district court. Ramos and Gonzalez contend that the knowledge and information possessed by Bohlig and his fellow officers did not rise to the level of that held sufficient to support probable cause in *Draper* and *Gates.* While *Draper* and *Gates* offer considerable instruction and guidance for our resolution of the case, they do not support the conclusion urged by Ramos and Gonzalez. In *Draper,* the informant gave to the police a detailed physical description of Draper and his clothing.[5]

isted to arrest Ramos and Gonzalez, the officers had enough information to form a "reasonable suspicion," *United States v. Danielson,* 728 F.2d 1143, 1146 (8th Cir.), *cert. denied,* 469 U.S. 919, 105 S.Ct. 300, 83 L.Ed.2d 235 (1984), with a "particularized and objective basis," *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95 66 L.Ed.2d 621 (1980), that Ramos and Gonzalez were committing a crime.

**4.** Ramos and Gonzalez also matched certain aspects of the drug courier profile, particularly in that they made frequent turn-around flights to Minneapolis-St. Paul from Miami. This fact is relevant both to the existence of a reasonable suspicion sufficient to justify an investigatory stop, *Royer,* 460 U.S. at 502, 103 S.Ct. at 1325,

and to the existence of probable cause. *United States v. Swayne,* 700 F.2d 467, 471 (8th Cir. 1983); *cf. Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (fact that individual matches some characteristics of the drug courier profile, although relevant, is not enough standing alone to establish probable cause).

**5.** The informant told the authorities that Draper "was a Negro of light brown complexion, 27 years of age, 5 feet 8 inches tall, weighed about 160 pounds, and that he was wearing a light colored raincoat, brown slacks and black shoes." *Draper,* 358 U.S. at 309 n. 2, 79 S.Ct. at n. 2. He also predicted that Draper would be

*Draper,* 358 U.S. at 309, 79 S.Ct. at 331. The informant stated that Draper would arrive in Denver on one of two dates, on a train from Chicago, and that he would be carrying three ounces of heroin; the informant also described Draper as habitually walking very fast. *Id.* On the second of two mornings indicated by the informant, the police observed a man fitting Draper's description alight from an incoming Chicago train. The police arrested him and he proved to be carrying heroin and a syringe. *Id.* at 310, 79 S.Ct. at 331. The Supreme Court held that Draper's arrest was supported by probable cause as, at the time of the arrest, "[the arresting officer] had personally verified every facet of the information given him by [the informant] except whether [Draper] had accomplished his mission and had the three ounces of heroin on his person or in his bag," *id.* at 313, 79 S.Ct. at 333; thus, the arresting officer had probable cause "to believe that the remaining unverified bit of * * * information— that Draper would have the heroin with him—was likewise true." *Id.*

The Supreme Court in *Gates* characterized *Draper* as "the classic case on the value of corroborative efforts of police officials." *Gates,* 462 U.S. at 242, 103 S.Ct. at 2334. The Court drew extensively upon its language in *Draper* in concluding that adequate probable cause existed to arrest and search the *Gates* defendants, Lance and Sue Gates. The information which led to the Gateses' arrest was contained in an anonymous letter. *Id.* at 225, 103 S.Ct. at 2325. This letter identified the Gateses as drug dealers, and outlined their *modus operandi:* Sue drives a car down to Florida and flies back to Bloomingdale, Illinois; Lance files down to Florida, buys the drugs and loads them into the car; Lance then drives the car back to Bloomingdale. *Id.* The letter further stated that on "May 3 [Sue] is driving down there again and Lance will be flying down in a few days to drive it back." *Id.* The police learned that "L. Gates" had a reservation to fly to West Palm Beach, Florida on May 5. In Florida, Lance was observed checking into a hotel

room registered to Susan Gates. He left the hotel the following day, accompanied by an unidentified female, in a car bearing a license plate registered to the Gateses. *Id.* at 266, 103 S.Ct. at 2347. The police obtained a warrant to search the Gateses' house and car based on this information.

The Court observed that the anonymous letter standing alone could not support probable cause. *Id.* at 227, 103 S.Ct. at 2326. The letter's contents, however, were corroborated in large part by police investigation. Also, it "contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." *Id.* at 245, 103 S.Ct. at 2335. The detailed nature of the tip suggested that the informant had obtained the information from the Gateses or from someone they trusted. *Id.* at 246, 103 S.Ct. at 2336. Moreover, the accuracy of most of the letter made it permissible to conclude that the information about the Gateses' illegal activities was also reliable. *Id.* at 245–46, 103 S.Ct. at 2335–36. The Court concluded that although this information may not have been adequate under the elaborate rules for assessing probable cause developed in the wake of *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), under the flexible "totality of the circumstances" test,

> probable cause does not demand the certainty we associate with formal trials. It is enough that there was a fair probability that the writer of the anonymous letter had obtained his entire story either from the Gateses or someone they trusted. And corroboration of major portions of the letter's predictions provides just this probability.

*Gates,* 462 U.S. at 246, 103 S.Ct. at 2336. The search of the Gateses' car and home was based on adequate probable cause and thus valid.

We recognize that "because of the myriad of unique factors that may go into a determination of probable cause, each case must be decided on its own facts; one decision seldom disposes of the next."

carrying a "tan zipper bag." *Id.* at 309, 79 S.Ct. at 331.

*United States v. Sumpter*, 669 F.2d 1215, 1218 (8th Cir.1982). The information Bohlig and his fellow officers possessed about Ramos and Gonzalez at the time of their arrest, however, is strikingly similar to that possessed by the arresting officers in *Draper* and *Gates*. Bohlig and his fellow officers knew that Informant No. 1 had described the Magda Llovet drug operation in some detail, and Informant No. 2 had corroborated the existence of the Llovet operation, the involvement of "Manuela," and "Manuela's" phone number. Officer Bohlig personally verified that Manuela Torres frequently visited Llovet in prison. The district court properly acknowledged the value of this type of interlocking information in assessing the credibility of Informant No. 1's tip. *See United States v. Reivich*, 793 F.2d 957, 960 (8th Cir.1986) (noting the enhanced credibility of independently consistent stories); *United States v. McGlynn*, 671 F.2d 1140, 1145 (8th Cir. 1982) (reliability of tip is enhanced if corroborated by an independent source). Informant No. 1 also gave Bohlig a physical description of Ramos, which Bohlig later personally verified. Bohlig and his fellow officers knew that Informant No. 1 had made a number of accurate predictions about Ramos. He predicted that Ramos traveled with a female companion; this was confirmed through the airplane tickets found after Ramos' March 3 trip, and by Bohlig's personal observation on March 28. Informant No. 1 predicted that Ramos and his companion made quick, turn-around flights from Miami to Minneapolis-St. Paul at two- to three-week intervals; this was again confirmed by the airplane tickets and by Bohlig's personal observation. Informant No. 1 also predicted that Ramos stayed at one of two hotels while in Minneapolis-St. Paul; this prediction was confirmed as to one of the hotels on the March 3 trip to Minneapolis-St. Paul.

In *Draper, Gates,* and this case, therefore, the tip or informant described in some detail the method by which the defendants conducted their illegal operations.[6] In each case, police investigation confirmed "innocent"[7] details of the tips, including physi-

6. We see no significant difference among the statements that Draper would be arriving on a train from Chicago carrying drugs, that Lance Gates would be driving back to Bloomingdale carrying drugs in a car left by his wife in Florida, and that Ramos and his female companion would fly to Minneapolis-St. Paul on a quick, turn-around flight from Miami carrying drugs and would stay at one of two hotels. Ramos and Gonzalez strenuously assert that Informant No. 1's failure to provide an exact date for the March 28 trip distinguishes this case from *Draper* and *Gates*. Yet the tip in *Gates* only stated that the drug run would occur "in a few days," *Gates*, 462 U.S. at 213, 103 S.Ct. at 2319, and, precisely as in this case, the police relied on a citizen-informant to determine the specific date that Gates flew to Florida to retrieve his car. *Id.* at 226, 103 S.Ct. at 2325. In *United States v. Sanders*, 631 F.2d 1309 (8th Cir.1980), *cert. denied*, 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981), this court held that probable cause existed to make a warrantless arrest where the tip merely identified a location and time where drug transactions "often occurred" and described the participants. *Id.* at 1311–12. And in *United States v. Rose*, 731 F.2d 1337 (8th Cir.), *cert. denied*, 469 U.S. 931, 105 S.Ct. 326, 83 L.Ed.2d 263 (1984), we upheld the validity of a search warrant based in part on a tip that a bank robbery would occur "within a few days" of May 7 and the robbery in fact occurred on May 12. *Id.* at 1344. We conclude that Informant No. 1's failure to predict the exact date on which Ramos would arrive in Minneapolis-St. Paul with cocaine does not make his tip fatally deficient when considered in light of its detail and the degree to which it was corroborated by police investigation.

7. Ramos and Gonzalez repeatedly complain that the police were unable to verify any *illicit* activity on their part prior to arresting them. They suggest that it is necessary for a suspect to behave suspiciously before there is probable cause to make an arrest. It is certainly true that furtive gestures, assumed names, and flight from police are all relevant to the existence of probable cause. *See United States v. McGlynn*, 671 F.2d 1140, 1144 (8th Cir.1982) (officer observed furtive gestures and exchange of large amount of cash); *United States v. Sadosky*, 732 F.2d 1388, 1394–95 (8th Cir.) (suspect attempted to conceal item from view of officers and was traveling under an assumed name), *cert. denied*, 469 U.S. 884, 105 S.Ct. 254, 83 L.Ed.2d 191 (1984). It is equally true that probable cause to make an arrest is supported where the precise criminal conduct the police suspect is confirmed before the arrest. *See Swayne*, 700 F.2d at 470–71 (suspect claimed luggage known to police officers to contain contraband). This court, however, has long recognized that the corroboration of minor, innocent details can suffice to establish probable cause. *See United States v. Lueth*, 807 F.2d 719, 726 (8th Cir.1986);

cal descriptions of and predictions of future actions by third parties. Such future actions are "ordinarily not easily predicted," *Gates*, 462 U.S. at 245, 103 S.Ct. at 2336, and their confirmation suggests that Informant No. 1 "also had access to reliable information of [Ramos and Gonzalez's] alleged illegal activities." *Id.* (footnote omitted). Bohlig and his fellow officers, at the time they initially stopped Ramos and Gonzalez, had "verified every facet of the information given [them] by [Informant No. 1] except whether," *Draper*, 358 U.S. at 313, 79 S.Ct. at 333, Ramos and Gonzalez were carrying cocaine. Thus, we conclude that, as in *Draper* and *Gates*, a reasonably prudent police officer would be warranted in believing "that the remaining unverified bit of information—[that Ramos and Gonzalez would be carrying four to six pounds of cocaine]—was likewise true." *Id.* We have reviewed the entire record from the suppression hearing and have assessed the information possessed by the arresting officers in a common-sense, non-technical fashion, as our governing cases require. *Gates*, 462 U.S. at 230, 103 S.Ct. at 2328; *Briley*, 726 F.2d at 1306 n. 3. We hold that the district court's determination that Ramos' and Gonzalez's arrest was supported by adequate probable cause is not clearly erroneous.

We affirm the convictions of Roberto Ramos and Elsa Gonzalez.[8]

*United States v. Arenal,* 768 F.2d 263, 267 (8th Cir.1985); *United States v. Robinson,* 756 F.2d 56, 60 (8th Cir.1985). "The theory connecting reliability and corroboration is that an informant who is correct about some things more likely will be correct about critical unverified facts, and it is not necessary to a finding of reliability that the corroboration extend to illegal activity as well as to innocent details." *United States v. Reivich,* 793 F.2d 957, 960 (8th Cir.1986) (citations omitted).

8. Counsel for Gonzalez strenuously urged at the oral argument of this case that even if probable cause existed to arrest Ramos, the arresting officers had no probable cause to arrest Gonza-

lez because Informant No. 1 had said nothing about her save that Ramos "traveled with a female companion." However, given the fact that the police were aware that Informant No. 1 had predicted that Ramos would be carrying four to six pounds of cocaine, that Gonzalez had reserved her ticket with Ramos, and that the two were traveling together, we think that the arresting officers would have been derelict in their duty to have failed to arrest and search Gonzalez. *See Swayne,* 700 F.2d 470–71; *United States v. Capers,* 685 F.2d 249, 251 (8th Cir. 1982); *United States v. Lugo-Baez,* 412 F.2d 435, 438 (8th Cir.1969), *cert. denied,* 397 U.S. 933, 90 S.Ct. 1000, 25 L.Ed.2d 257 (1970).