UNITED STATES of America, Appellee,

v.

Julian Jorge MORALES, Appellant.

No. 89–5606.

United States Court of Appeals,
Eighth Circuit.

Submitted June 12, 1990.

Decided Jan. 17, 1991.

James Ostgard, Minneapolis, Minn., for appellant.

Andrew Dunne, Asst. U.S. Atty., Minneapolis, Minn., for appellee.

Before LAY, Chief Judge, HEANEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

Julian Jorge Morales appeals from his conviction entered on a conditional guilty plea of possessing cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) (1988). On appeal, he argues that police lacked probable cause for his arrest and that the warrantless search of his luggage was not a lawful

search incident to that arrest. Finally, he argues that the district court erred in failing to give a two level reduction under the federal sentencing guidelines for acceptance of responsibility. We affirm the judgment of the district court[1] and the sentence.

On the morning of July 9, 1989, Officer Stephen Moss of the Minneapolis/St. Paul International Airport Police received information from a confidential informant that a black Cuban male known as "Chico" would depart by bus from the Minneapolis Greyhound Bus Depot at about noon that day with one kilogram or more of cocaine. The informant described Chico as about 5'8" tall, weighing 140 to 150 pounds, 20 to 30 years old, with short black hair. The informant stated that Chico's destination was New York and that he would be carrying a small black bag and a small shiny handgun. The informant also stated that Chico would be wearing jeans, high-top tennis shoes, and a black T-shirt.

Officer Moss arrived at the Minneapolis Greyhound Bus Depot at about 10:45 a.m. with three other law enforcement officers. A ticket agent told them that a bus would be leaving for New York at 12:30 p.m. While Moss was waiting, his dispatcher paged him and reported that the informant had called again and stated that Chico would instead depart from the Greyhound Depot in St. Paul. The informant further stated that Chico would arrive at 3:20 p.m. in a red pick-up truck with a white topper.

The officers went to the St. Paul depot, where a ticket agent told them that a Hispanic male, about 5'8" tall and weighing 140 pounds, had just purchased with cash a one-way ticket to New York on a bus scheduled to depart at 3:45 p.m. The ticket agent also said that the man had no prior reservation, and that he was wearing jeans and a black T-shirt, carrying a small black bag, and was accompanied by a Hispanic female.

Moss again talked to the informant, who told him that Chico had purchased a one-way ticket to New York at the St. Paul depot for $125 cash, that the bus was leaving at 3:45 p.m., and that Chico would be with a Hispanic female. The informant further said that Chico would have carry-on bags, including a small black bag.

At about 3:30 p.m., a red Ford pick-up truck with a white topper arrived at the depot. Moss saw an individual fitting the description given by the informant and the ticket agent, except that the man was not wearing a black T-shirt. The individual was accompanied by a woman and was carrying a black knapsack and a red duffel bag. As they entered the doors, the man handed the woman the black bag and opened the inner door for her. When they stepped inside, she handed the black bag back to him. The officers then approached, showing their identification, and stating that they were police officers. The woman then said "What is this, Chico?"

Officer Bruce Giller, also of the Airport Police, pushed Morales up against a nearby wall, told him he was under arrest for narcotics, and that he and his bags would be searched. Officer Moss took the bags and searched them, standing about three feet away from Morales, who stood spread-eagled against the wall but was not handcuffed. Inside the red duffel bag Moss found a black leather business pouch that contained one kilogram of cocaine. The red bag also contained a grey plastic shopping bag that held several clear plastic baggies containing cocaine. No weapon was found.

One of the officers searched the purse carried by the woman and found two plastic baggies containing 56 grams of cocaine. At that point Morales said, "Leave the woman out of this. All the cocaine is mine. I put that in there." The woman was neither handcuffed nor arrested. Police gave Morales *Miranda* warnings, and he made no further statements.

After Morales was charged, his attorney filed a motion to suppress evidence. At the hearing, Officer Moss testified that his in-

---

**1.** The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

formant had provided reliable, verified information to him on at least four previous occasions. This information had included the names and telephone numbers of drug couriers, travel schedules, and locations of safe houses. Although the information had not led to any arrests, none of the information furnished by the confidential informant had proved to be incorrect.

The magistrate, in his report and recommendation stated that under the totality of the circumstances, probable cause existed for Morales' arrest. *United States v. Morales*, No. 3–89–78, slip op. at 5–6 (D.Minn. Sept. 8, 1989). The search of the bags was proper as the officers had information that Morales may have been armed, and because the search was supported by a valid arrest. *Id.* at 6. The magistrate further found that the bags were within the area of Morales' immediate control, bringing them within the scope of a valid search incident to arrest. *Id.* at 7. The magistrate also found that Morales' inculpatory statement to the agents was not made in response to a question and was therefore outside the scope of *Miranda*. *Id.* at 9.

The district court conducted a de novo review of the record and adopted the magistrate's report and recommendation. *United States v. Morales*, No. 3–89–78 (D.Minn. Sept. 25, 1989). After the entry of the guilty plea, the district court denied a two level reduction for acceptance of responsibility and sentenced Morales to 104 months under the guidelines.

## I.

■ Morales argues that the police lacked probable cause to arrest him because the informant's tip lacked reliability and because the details of the tip that police independently verified concerned conduct that was outwardly "innocent." Morales contends that these details—including bus departure times, the cash purchase of a one-way ticket, the physical description of Morales, and his nickname of "Chico"—could readily be known to any observer and do not indicate anything suspicious. The government counters that the corroboration of many "innocent" details

enhanced the tip's reliability, giving officers reasonable grounds to believe that the informant had supplied equally accurate information regarding Morales' criminal activities. The government contends that verification of totally innocent details can provide an adequate basis for probable cause.

■ On appeal, the district court's finding of probable cause to arrest is reviewed under the clearly erroneous standard. *United States v. Wajda*, 810 F.2d 754, 758 (8th Cir.), *cert. denied*, 481 U.S. 1040, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987); *United States v. Williams*, 897 F.2d 1430, 1435 (8th Cir.1990); *United States v. Woolbright*, 831 F.2d 1390, 1393 (8th Cir.1987). We will affirm the district court's determination of probable cause unless it lacks the support of substantial evidence, or resulted from an erroneous conception of the applicable law, or our consideration of the entire record leaves us with the "definite and firm conviction that a mistake has been made." *United States v. McGlynn*, 671 F.2d 1140, 1143 (8th Cir.1982) (citations omitted).

■ Police officers have probable cause to make an arrest "if the 'facts and circumstances within the [law enforcement] officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *United States v. Caves*, 890 F.2d 87, 93 (8th Cir.1989) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979)). *See also Wajda*, 810 F.2d at 758 ("[p]robable cause exists to make a warrantless arrest when, at the moment of the arrest, the collective knowledge of the officers involved ... was 'sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense'") (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)).

■ The determination of probable cause does not "'rest on isolated facts; rather it depends on the cumulative effect of the facts in the totality of the circum-

stances.' " *Warren v. City of Lincoln,* 864 F.2d 1436, 1440 (8th Cir.) (quoting *United States v. Archer,* 840 F.2d 567, 573 (8th Cir.1988)), *cert. denied,* 490 U.S. 1091, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989). While a " 'bare suspicion' of criminal activity is not sufficient to establish probable cause," neither are police "required to have enough evidence to justify a conviction before they make a warrantless arrest." *Caves,* 890 F.2d at 93.

Looking at the cumulative effect of the facts in the totality of the circumstances, we are convinced that the information known to police officers raised far more than a "bare suspicion" of criminal activity and in fact firmly established probable cause. The confidential informant had supplied reliable information to Officer Moss on at least four previous occasions. Here, the informant had supplied detailed information about the appearance and actions of Morales. In assessing the tip's reliability, the most significant elements were those that predicted Morales' future actions, including his planned departure to New York at 3:45 p.m. and his arrival at the bus depot at a particular time in a particular vehicle accompanied by a woman. While Morales did not depart from the Minneapolis depot as the informant had originally predicted, the informant promptly relayed to police Morales' change of travel plans.

In *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court strongly endorsed corroboration as a method to establish the reliability of a tip. In *Gates,* the corroboration of an anonymous letter writer's predictions about the defendants' destination and dates and methods of travel "indicated, albeit not with certainty, that the informant's other assertions also were true." *Id.* at 244, 103 S.Ct. at 2335. The *Gates* Court relied strongly on *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), which it called "the classic case on the value of corroborative efforts of police officials." *Gates,* 462 U.S. at 242, 103 S.Ct. at 2334. In *Draper,* an informant reported that a man named Draper would arrive in Denver on one of two dates on a train from Chicago and that he would be bringing heroin. 358 U.S. at 309, 79 S.Ct. at 331. The informant also supplied a detailed physical description of *Draper* and stated that he would be carrying a "tan zipper bag" and would be walking "real fast" as was his habit. *Id.* The *Draper* informant had always given accurate information in the past, and on this occasion, the narcotics agent was able to "personally verif[y] every facet of the information" except whether Draper "had accomplished his mission." *Id.* at 313, 79 S.Ct. at 333. With such corroboration, the agent "had 'reasonable grounds' to believe that the remaining unverified bit of [the informant's] information—that Draper would have the heroin with him—was likewise true." *Id.*

In *United States v. Ramos,* 818 F.2d 1392 (8th Cir.1987), this court relied on *Draper* and *Gates* to uphold a finding of probable cause when an informant had supplied details concerning the operations of a drug ring and the movements of a particular courier. The courier, Ramos, regularly transported cocaine to St. Paul from Miami, making "quick turn around" flights about every two weeks, according to the tip. *Id.* at 1393. The informant also described Ramos' appearance, stated that he traveled with a woman, and also identified the hotels at which Ramos habitually stayed. *Id.* A second informant corroborated the existence of the drug ring and some of the details of its operation. *Id.*

Police confirmed the information regarding Ramos' appearance, the fact that he traveled with a woman, that he made frequent trips between Miami and St. Paul, and that he stayed at one of two particular hotels. *Id.* at 1397. As in *Draper* and *Gates,* "a reasonably prudent police officer would be warranted in believing" that the descriptions of Ramos' criminal activity were also true. *Id.* at 1398.

The same analysis applies in the case before us. The confidential informant described Morales in some detail, stating that he was a black Cuban,[2] about 5'8" tall, 140

---

2. Morales, who is black, argues that the infor-

mant inaccurately described him as Hispanic.

to 150 pounds, 20 to 30 years old with short black hair. The officers visually corroborated this information and also confirmed that Morales wore the attire—jeans and high-top tennis shoes—that the informant predicted he would. While Morales was not wearing a black T-shirt at the time of arrest as the informant had predicted, he did arrive at the depot at the appointed time in a red pick-up with a white topper accompanied by a woman. He also carried a "black bag," although the bag spotted by police was not the one that contained the cocaine. A bus station ticket agent had confirmed that a man fitting the description given by the informant had purchased a one-way ticket to New York with cash, that the bus was scheduled to depart at 3:45, and that the unidentified male was accompanied by a Hispanic woman. When police approached the man and the woman exclaimed "What is this, Chico?"—thereby confirming the man's nickname—police had independently verified virtually every detail of the tip except whether Morales was carrying cocaine.

The prudent police officer, evaluating the near-total corroboration of the tip in conjunction with the informant's history of veracity, would indeed have reasonable grounds to believe that Morales had committed or was about to commit an offense. Morales argues, however, that the aspects of the informant's tip corroborated by police concerned only "innocent" behavior and that the police had not verified that any criminal activity was taking place. Verification of innocent details, he contends, cannot suffice to establish probable cause.

The Supreme Court expressly rejected this argument in *Gates*, pointing out that "*all* of the corroborating detail established in *Draper* was of entirely innocent activity." 462 U.S. at 244 n. 13, 103 S.Ct. at

2335 n. 13 (emphasis in original). The Court added:

> [P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. By hypothesis, therefore, innocent behavior frequently will provide the basis for a showing of probable cause.... In making a determination of probable cause the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of non-criminal acts.

*Id.*

This court has repeatedly stated that the presence of probable cause does not depend on the verification of illicit or even furtive activity; the "corroboration of minor, innocent details can suffice to establish probable cause." *Ramos*, 818 F.2d at 1397 n. 7. *See also United States v. McBride*, 801 F.2d 1045, 1047 (8th Cir.1986) ("As we have made clear even in cases involving the higher degree of reliability needed to establish probable cause, it is immaterial that the details corroborating an informant's tip are as consistent with innocent conduct as with illegal activity"), *cert. denied*, 479 U.S. 1100, 107 S.Ct. 1325, 94 L.Ed.2d 177 (1987); *United States v. Reivich*, 793 F.2d 957, 960 (8th Cir.1986) ("it is not necessary to a finding of reliability that the corroboration extend to illegal activity as well as to innocent details").

In the case before us, the corroboration of the tip's "innocent" details made it reasonable to believe that descriptions of Morales' illegal activities were accurate. *See Gates*, 462 U.S. at 244–45, 103 S.Ct. at 2335–36. We therefore conclude that the district court's finding of probable cause was not clearly erroneous.

## II.

■ Morales also argues that the warrantless search of his bags failed to satisfy

There is conflicting testimony on this point. Officer Moss, who spoke to the informant, testified that the informant described "Chico" as Hispanic. Officer Giller, who participated in the arrest of Morales but did not speak directly to the informant, testified that the informant described "Chico" as a black Cuban. The report

of investigation filed by Giller also states that the informant described "Chico" as a black Cuban. This inconsistency in the record may be attributed to the difficulty in making an accurate racial identification of Morales. The ticket agent, for instance, described the man fitting Chico's description as Hispanic.

the requirements for a valid search incident to arrest. We review the magistrate's findings, which were adopted by the district court, under the clearly erroneous standard. *United States v. Lucas*, 898 F.2d 606, 609 (8th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 112, 112 L.Ed.2d 81 (1990).

Morales relies on *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), *United States v. Schleis*, 582 F.2d 1166 (8th Cir.1978), and *United States v. Stevie*, 582 F.2d 1175 (8th Cir.1978), *cert. denied*, 443 U.S. 911, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979), to argue that absent exigent circumstances, a warrant is required to search luggage that has come into the "exclusive control" of police officers. Morales contends that he had an expectation of privacy in his closed luggage, and that while the arrest may have justified the seizure of the luggage, it did not justify its warrantless search. This argument fails to respond to the statement of the Supreme Court in *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), that the "justification for the search is not that the arrestee has no privacy interest in the container, but that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have." *Id.* at 461, 101 S.Ct. at 2864.

The magistrate's report found that the bags were in the "immediate control" of Morales, slip op. at 7, thus applying the proper standard for determining the validity of a search incident to arrest. *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). In *Chimel*, the Court stated: "There is ample justification ... for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Id.*

Subsequent decisions of the Supreme Court and this court have interpreted the phrase "immediate control" to extend beyond the area that is conveniently or easily accessible to the arrestee. In *Belton*, the Supreme Court held that a police officer who has lawfully arrested the occupant of an automobile may, contemporaneously with that arrest, search the passenger compartment, even if the arrestee is no longer inside it. 453 U.S. at 459–60, 101 S.Ct. at 2863–64. The lawful scope of this search extends to any containers found within the passenger compartment. *Id.* at 460, 101 S.Ct. at 2864.

Similarly, in *United States v. Palumbo*, 735 F.2d 1095 (8th Cir.), *cert. denied*, 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 268 (1984), we held that "accessibility, as a practical matter, is not the benchmark" in assessing the validity of a search incident to arrest. *Id.* at 1097. The question is whether the evidence is "in the area within the immediate control of the arrestee" under *Chimel. Id.* This area "is not constrained because the arrestee is unlikely at the time of the arrest to actually reach into that area." *Id.*

Applying these principles, we upheld in *Palumbo* the actions of officers who searched an area behind a dresser drawer while the arrestee stood handcuffed in the same room. *Id. See also Lucas*, 898 F.2d at 609–10 (search of kitchen cabinet as handcuffed arrestee was being led from the kitchen, but where cohorts at kitchen table were not yet handcuffed, was a valid search incident to arrest); *United States v. Mefford*, 658 F.2d 588, 591–93 (8th Cir. 1981) (although police officer held arrestee's sack, the sack was still within arrestee's area of "immediate control"), *cert. denied*, 455 U.S. 1003, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982); *cf. United States v. Blackman*, 904 F.2d 1250, 1254 n. 3 (8th Cir.1990) (search of car trunk cannot be justified as a lawful search incident to arrest because the trunk was not within reach of arrestee).

In the case before us, the magistrate found, and the district court agreed, that the bags were within Morales' area of "immediate control." Slip op. at 7. The record establishes that Morales was holding the bags when the officers approached, that he was approximately three feet away from the bags when they were searched, and that he was not handcuffed. The

woman accompanying Morales was approximately six feet away and she was not handcuffed either. Regardless of whether the bags were easily accessible to Morales, they were within the area of "immediate control" as defined by *Chimel, Belton,* and the cases of this court.

Morales nonetheless argues that *Chadwick* establishes that when police have reduced a closed container to their "exclusive control," they must secure a warrant before opening and searching that container. *See Chadwick,* 433 U.S. at 15–16, 97 S.Ct. at 2485–86. Morales' argument fails to recognize, however, the distinction between searches that are contemporaneous with arrest and those that are " 'remote in time or place from the arrest.' " *Id.* at 15, 97 S.Ct. at 2485. The *Belton* Court pointed out that the search in *Chadwick* occurred more than one hour after police gained exclusive control of the arrestee's footlocker; the search thus could not be justified as incident to the arrest. *Belton,* 453 U.S. at 462, 101 S.Ct. at 2865. The *Belton* Court rejected the application of the "exclusive control" test to a search that is contemporaneous with the arrest, stating:

> It seems to have been the theory of the Court of Appeals that the search and seizure in the present case could not have been incident to the respondent's arrest, because Trooper Nicot, by the very act of searching the respondent's jacket and seizing the contents of its pocket, had gained "exclusive control" of them.... But under this fallacious theory no search or seizure incident to a lawful custodial arrest would ever be valid; by seizing an article even on the arrestee's person, an officer may be said to have reduced that article to his "exclusive control."

453 U.S. at 461–462 n. 5, 101 S.Ct. at 2864–65 n. 5. (citation omitted).

*Belton* thus abolishes the exclusive control distinction of *Chadwick* when the search is contemporaneous with the arrest. *See United States v. Johnson,* 846 F.2d 279, 282 (5th Cir.), *cert. denied,* 488 U.S. 995, 109 S.Ct. 562, 102 L.Ed.2d 587 (1988). Consequently, our earlier decisions in

*Schleis* and *Stevie,* to the extent that they held that a police officer's "exclusive control" is enough to trigger the warrant requirement, can no longer be considered good law in light of *Belton. See Schleis,* 582 F.2d at 1172; *Stevie,* 582 F.2d at 1179–80.

In sum, *Chimel, Chadwick,* and *Belton* establish the permissible scope of a search incident to arrest—namely, that the search must fall within the arrestee's area of "immediate control" and must be contemporaneous with the arrest. Searches that are similar to the one in the case before us have been routinely upheld in other circuits. *See, e.g., United States v. Andersson,* 813 F.2d 1450, 1455–56 (9th Cir.1987) (search of suitcase on bed next to arrestee valid because it occurred at about the same time as arrest); *United States v. Herrera,* 810 F.2d 989, 990 (10th Cir.1987) (per curiam); *United States v. Rosenthal,* 793 F.2d 1214, 1232 (11th Cir.) (search of handbag incident to arrest was lawful even though handbag was not within defendant's immediate reach), *modified on other grounds,* 801 F.2d 378 (1986), *cert. denied,* 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987); *United States v. Cervantes–Gaitan,* 792 F.2d 770, 772 (9th Cir.1986); *United States v. Silva,* 745 F.2d 840, 847 (4th Cir.1984), *cert. denied,* 470 U.S. 1031, 105 S.Ct. 1404, 84 L.Ed.2d 791 (1985); *United States v. Litman,* 739 F.2d 137, 139 (4th Cir.1984) (en banc).

We conclude that the finding of the magistrate adopted by the district court that the bags were within Morales' area of immediate control is not clearly erroneous and that the search was therefore lawful.

### III.

■ Morales also argues that the district court erred in failing to grant him a two-level reduction under the federal sentencing guidelines for acceptance of responsibility, *see United States Sentencing Commission, Guidelines Manual,* § 3E1.1 (Nov. 1990), and that the court's findings on this issue are entirely unsupported by the record. Morales states that he is entitled to the reduction because he never wa-

vered in his willingness to inform the government of the identity of his source.

The Presentence Investigation Report (PSI), which the district court adopted in its findings of fact, states that Morales had not provided the authorities with any information regarding his source or the person to whom he was to deliver the cocaine. Morales' counsel stated at oral argument that two days before sentencing, Morales, within the context of blaming the source for "entrapping" or setting him up, expressed his belief that his source also was the government informant. Morales further stated that the person to whom he was to deliver the cocaine in New York did not exist because the entire deal was a set-up. The government claims that both of these statements were incorrect.[3] Counsel for the government made other statements at argument that may be read as conceding that Morales had disclosed the source of the drugs.

In a written statement of reasons for imposing sentence, the district court stated that Morales "is not entitled to an acceptance of responsibility reduction because he changed his story over time and because he lied to the probation officer regarding the details of his offense." *Statement of Reasons for Imposing Sentence*, No. 3–89–078, slip op. at 3 (D.Minn. Dec. 11, 1989).[4]

The government conceded at oral argument that nothing in the record showed that Morales actually lied, other than the fact that his version of the events—that the source was the informant and that the delivery was a set-up—was erroneous.

Morales argues that his belief was nothing more than an opinion and that it was a logical one given the detailed nature of the informant's tip. The district court based its denial of the reduction on broader grounds than its finding that Morales had lied. The district court observed that "acceptance of responsibility requires complete candor, *as well as contrition.*" *Statement of Reasons for Imposing Sentence,* at 3. (emphasis added). Moreover, at the sentencing proceeding, the district court stated that Morales' overall actions "do not rise to what this Court believes is as (sic) an acceptance of responsibility." Sentencing Transcript at 7.

Sentencing Guideline § 3E1.1 allows the court to award a two level reduction for acceptance of responsibility to a defendant who "clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." The application note for that section stresses voluntary action by the defendant, including "voluntary and truthful admission ... of involvement in the offense and related conduct." U.S.S.G. § 3E1.1, comment. (n. 1). The express language of the guideline and the application note demonstrate that the burden for establishing acceptance of responsibility is on the defendant. *See United States v. Dinges,* 917 F.2d 1133, 1135 (8th Cir.1990) (" '[t]he guidelines contemplate that the government has the burden of proving the applicability of sections which would enhance the offense level and the defendant has the burden of proving the applicability of guideline sections which would reduce the offense level' "); *United*

---

**3.** The government stated at oral argument that at the time the PSI was prepared, government agents had not yet interviewed Morales regarding his source. At oral argument, the Assistant U.S. Attorney stated that "various factors, including a language barrier," had prevented the scheduling of the interview until two days prior to sentencing. The body of the PSI report makes clear, however, that Morales had been interviewed before its preparation.

**4.** The district court's statement at the sentencing proceeding on December 7, 1989, differs somewhat from the written statement filed on December 11. At the hearing, the court stated:
THE COURT: ... Having heard the information that has been presented with respect

to the matter, the Court does find that the defendant has not accepted responsibility in this matter as contemplated, that the Court does not feel the arguments presented are particularly well founded with respect to the defendant; that there have been changes in stories and have been all kinds of things that fit into this, but they do not rise to what this Court believes is as [sic] an acceptance of responsibility. For that reason the Court would deny the request for acceptance of responsibility and make a finding of which I am going to make partial findings and ask for partial assistance from counsel or the probation officer.
Sentencing Transcript at 7–8.

*States v. Williams,* 905 F.2d 217, 218 (8th Cir.1990) ("[t]he government bears the burden of proving facts that support a sentence enhancement and the defendant bears the burden of proving facts that support a sentence reduction"), *cert. denied,* — U.S. ——, 111 S.Ct. 687, 112 L.Ed.2d 678 (1991).

The district court found that Morales did not meet his burden of establishing that he accepted responsibility. Application Note 5 to section 3E1.1 states: "The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review." *See also United States v. Thompson,* 876 F.2d 1381, 1384 (8th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 192, 107 L.Ed.2d 147 (1989); *United States v. Nunley,* 873 F.2d 182, 187 (8th Cir.1989).

The burden is on Morales to demonstrate that he is entitled to a two-level reduction for acceptance of responsibility. In the written objections filed by Morales' counsel, great stress is placed on Morales' belief that the source of the drugs must have been the informant, and, as we have observed, Morales' argument on appeal is similarly based on this opinion or belief. We are satisfied that the district court did not err in determining that Morales' statements, which essentially blamed others, fell short of establishing a clear, voluntary, and affirmative acceptance of responsibility.

The district court's determination that Morales did not accept the responsibility is entitled to great deference. Considering the record as a whole, we are satisfied that there is adequate foundation to support the conclusion of the district court that Morales did not meet his burden of establishing acceptance of responsibility. The concessions of the government do not show that Morales satisfied his burden under this guideline.

For the foregoing reasons, we affirm the judgment of the district court.

LAY, Chief Judge, dissenting in part.

In the present case, the district court erroneously believed the defendant lied to the authorities. The government conceded at oral argument that the district court was mistaken; that the defendant did not lie. With the government's explanation, since great deference should be given to a district court as to whether there should be departure from the guidelines, I respectfully submit that the case should be remanded to the district court for reevaluation in light of the government's candid appraisal of the record. With the obvious language barrier that existed between the defendant and the authorities, and the prior misunderstanding of the court, whether the district court would once again refuse to depart from the guidelines is speculative. The majority opinion simply substitutes its judgment for that of the district court. This is inappropriate. Therefore I dissent.