Alejandro **LOPEZ**, Petitioner,

v.

Charles R. **GREINER**, Superintendent, Greenhaven Correctional Facility, and Hon. Elliot L. Spitzer, Attorney General, State of New York, Respondents.

No. 02 Civ. 2685(GEL).

United States District Court,
S.D. New York.

April 12, 2004.

---

Lloyd Epstein, Epstein & Weil, New York City, for Petitioner.

Mark Dwyer, Assistant District Attorney, New York City (Robert M. Morgenthau, District Attorney for the County of New York), for Respondents.

## OPINION AND ORDER

LYNCH, District Judge.

Alejandro Lopez, an inmate at Greenhaven Correctional Facility, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He argues that he received ineffective assistance of counsel at his state trial and that Justice Leslie Crocker Snyder, who presided at that trial, should have recused herself because of her alleged participation in certain pretrial investigative activities. For the reasons that follow, the petition will be denied.

## BACKGROUND

On November 17, 1988, a New York jury convicted Lopez of criminal possession of a controlled substance in the first degree, N.Y. Penal Law § 220.21, and conspiracy in the second degree, id. § 105.15, crimes for which he was sentenced to consecutive terms of incarceration of, respectively, twenty-five years to life and eight and one-third to twenty-five years. At trial, the State presented evidence to show that between 1985 and 1987, Lopez controlled a narcotics trafficking and distribution ring known as the "Rock Organization," which sold glassine envelopes of crack-cocaine labeled "Rock," "Solid" or "Rock Solid," in the vicinity of 507 East 11th Street in Manhattan. (Resp.Br.4–5.) Then–New York City police officers Frank Bose and Bob Barchiesi played the chief roles in the investigation that culminated in Lopez's conviction, and in 1992, they published a book about the case entitled Rock Solid.[1] (Lopez's arguments refer frequently to this book.) The investigation continued for several years and involved numerous incidents ancillary to Lopez's offenses of conviction. Only facts relevant to the present petition will be recited here.

### I. The Search of the Loft

On August 21, 1985, a federal magistrate judge issued a warrant to search the fifth floor apartment of 405 Greenwich Street in Manhattan ("the Loft"). (Pet., Ex. I.) Lopez contests the factual basis for and validity of the warrant, and the evidence before the Court fails to disclose or make clear several important facts relevant to the somewhat atypical circumstances of its issuance. Despite being the principal police investigators with knowledge of Lopez's Rock Organization, neither Bose nor Barchiesi signed the affidavit presented in support of the search warrant; and despite the apparent absence of a relationship be-

---

1. Frank Bose & Bob Barchiesi, as told to Dolph LeMoult, Rock Solid (1992). Subsequent citations to Rock Solid in this Opinion refer to the paperback edition published by Jove Books in March 1993.

tween the Loft and any ongoing federal investigation, the warrant application was presented to a federal magistrate without, at least insofar as the record discloses, the participation of a prosecutor, state or federal.[2] Patrick Marshall, whom Lopez identifies as a policeman designated to work on a state-federal narcotics task force (Pet.¶ 24), prepared the warrant affidavit. (Pet., Ex. I.)

Marshall's affidavit avers that he spoke with two confidential informants, CI–1 and CI–2. CI–1 told Marshall that (1) he had numerous contacts with a cocaine distribution organization, which tried to recruit him on several occasions; (2) in June 1985, he saw cocaine and assorted narcotics paraphernalia in the Loft; (3) through his observations of and conversations with members of the organization, he became aware of the trademark manner in which the organization packages and distributes cocaine; (4) "on August 19, 1985, [he] saw two members of the organization leaving [the Loft] carrying packages which appeared to contain cocaine"; and (5) the organization sells cocaine labeled "Solid" in the vicinity of 507 East 11th Street in Manhattan. (Id. ¶¶ 1–3.)

CI–2 told Marshall that (1) on or about June 1, 1985, while present in the hallway outside the Loft, members of the organization tried to recruit him "to aid the sale of cocaine"; (2) on two prior occasions, while present in the Loft, he observed large quantities of cocaine stored in shoe boxes situated in an area referred to by a member of the organization as the "office"; and (3) the office held a safebox containing cash and cocaine, which CI–2 saw a member of the organization put inside the safebox. (Id. ¶ 4.)

Marshall also testified that "through independent investigation," he learned that one Raul Feliciano, a member of the organization, had been charged in a New York State complaint with a felony murder related to narcotics trafficking. On August 20, 1985, New York City police officers saw Feliciano "posing as a blind man" outside of 405 Greenwich Street, as well as "another member of the organization." Feliciano shouted something to the other member, and "three other men and a woman exited 405 Greenwich Street, joined [him, and] hurriedly entered an automobile," which "began driving in an evasive manner." The police arrested them. (Id. ¶ 5.)

Rock Solid does not mention Marshall. Bose and Barchiesi relate that they initially brought Irma Garcia (a/k/a "Blondie") and Raphael Martinez (a/k/a "Juahito"), a married couple that sold a brand of cocaine called "Pony–Pak," id. 32, to a meeting with a number of state prosecutors. Id. 52. The prosecutors listened to the witnesses, and then one of the prosecutors said, "Everything here is hearsay, not ad-

---

2. This is not to suggest that these circumstances, in and of themselves, render the warrant suspect. Before charges have been brought, whether by information or indictment, it may not be clear whether potential criminal charges will be brought under state or federal law, or both. Nor does either federal or New York State law require that a prosecutor participate in the preparation or presentation of a warrant application, or prohibit investigators from presenting a warrant application where one prosecutor has expressed skepticism about the existence of probable cause. Cf. People v. Bilsky, 95 N.Y.2d 172, 176–77, 712 N.Y.S.2d 84, 734 N.E.2d 341 (2000) (observing that the "constitutional principles" embodied in the Fourth Amendment to the United States Constitution and Article I, Section 12 of the New York State Constitution "do not restrain law enforcement officers from seeking successive authorizations before different Magistrates, where warranted when one Magistrate may initially decline to issue a search warrant for a myriad of reasons on or off the record").

missible in a state court," an appraisal with which the others agreed. *Id.* 53. Another prosecutor characterized the evidence as "stale." *Id.* Frustrated by the prosecutors' refusal to help them, Bose and Barchiesi spoke with John McCormack, a police officer "deputized to seek a warrant through the federal courts," and in the early afternoon, "they received word that a search warrant for the [Loft] had been issued." *Id.* 54.

*Rock Solid's* account thus suggests that all of the evidence in support of the warrant had been gathered by August 21, 1985, the same date on which, in the morning, Bose and Barchiesi had their unsuccessful meeting with state prosecutors, and in the early afternoon, received word that a federal court had issued the warrant. Indeed, Chapter Seven, which describes these events, is subtitled "August 21, 1985." *Id.* 52. But the District Attorney disputes this chronology. In a brief dated June 14, 2000, filed in response to Lopez's motion to vacate his sentence pursuant to N.Y.Crim. Proc. Law § 440.10, the District Attorney asserted:

> Bose and Barchiesi met with ADAs [at] the Office of the Special Narcotics Prosecutor on August 16, 1985, not August 20. The Warrant was not signed until August 21, 1985. Thus, the police officers had several days to investigate the Rock Organization further before the Warrant was issued. This is borne out by the supporting affidavit itself. The affidavit references information related to events occurring on August 18–20.

(Pet., Ex. D at 39 n. 10.) Other evidence before the Court – in particular, hearing transcripts of proceedings related to the District Attorney's prosecution of Lopez's brother Eduardo – suggest that Bose and Barchiesi arrested Garcia and Martinez on August 15; that the police interviewed them separately; that under interrogation, Garcia and Martinez made certain statements against penal interest; that their statements corroborated one another; that they served as confidential informants from August 15 to 21; and that the police independently corroborated at least some of the factual details, including those related to criminal activity, provided by Garcia and Martinez. (Pet. Ltr. dated Oct. 9, 2002, App.; Resp. Ltr. dated Oct. 30, 2002, Annex.) Moreover, in one of the transcripts, Bose testifies that "Garcia and Martinez were taken in before the [federal] district court, reaffirmed their information and the warrant was issued." (Resp. Ltr. dated Oct. 30, 2002, Annex at 12.) Many of these facts, if verified, would bear significantly on the warrant's validity. This evidence will be reviewed, to the extent relevant, in connection with the discussion below.

On the strength of Marshall's affidavit, then-Magistrate Judge Leonard Bernikow issued a warrant authorizing a search of the Loft for narcotics, narcotics paraphernalia, and records or proceeds of narcotics transactions. (Pet., Ex. I.) When the police executed the warrant, they recovered four and three-eights ounces of cocaine, assorted narcotics paraphernalia, firearms, financial records of the Rock Organization's cocaine sales, and paperwork bearing Lopez's name and address, including his lease and various utilities bills. (Resp.Br.7–8.) Largely on the basis of this evidence, a jury convicted Lopez of criminal possession of a controlled substance in the first degree. (Pet.¶ 4.) While the State presented ample additional evidence of Lopez's guilt of the conspiracy charge, Lopez's conviction for the possession charge, which carried the more severe sentence of twenty-five years to life, depended fundamentally on the fruits of the warrant. (*Id.* ¶¶ 4, 28.)

## II. *Alleged Judicial Impropriety*

Then–New York State Supreme Court Justice Leslie Crocker Snyder presided at Lopez's trial. Lopez alleges, again relying principally on purported facts derived from *Rock Solid*, that in "the two years leading up to [his] arrest, [Bose and Barchiesi] consulted Judge Snyder about this investigation, and she gave them advice and provided assistance to help them build their case." (Pet.¶16.) According to Lopez, Bose and Barchiesi "repeatedly consulted, and were aided in their investigation by, Judge Snyder." (*Id.* ¶ 83.) Only two passages in *Rock Solid*, however, conceivably support this allegation.

The first recounts Bose and Barchiesi's decision to fly to Puerto Rico themselves, in their personal capacity and without formal police authorization, to arrest Lopez. *Rock Solid* 236–38. At that time, according to *Rock Solid*, Bose and Barchiesi decided "that, rather than be accused of running a totally clandestine operation, they would notify everyone and anyone who was not in a position to stop them. That translated to anyone outside of the job who did not have the will or the authority to sabotage their plans." *Id.* 238. This group included Justice Snyder. *Rock Solid* says nothing, however, about consultations or participation by Justice Snyder in this or any other aspect of the investigation; only that Bose and Barchiesi informed her, as an individual "who was not in a position to stop them," of their intention to travel to Puerto Rico to arrest Lopez.

The second passage describes Justice Snyder's alleged response upon learning that Lopez had been taken into custody in Puerto Rico, but not extradited because of certain turf and public relations battles among federal, New York, and Puerto Rican law-enforcement agencies. At that time, *Rock Solid* relates, Barchiesi notified, among others, "ADA Patrick Conlon and Judge Leslie Crocker Snyder, both of whom responded without hesitation." *Id.* 260. *Rock Solid* does not make explicit the nature of Justice Snyder's "respon[se]," but Barchiesi and Bose relate that, shortly thereafter, they received offers of assistance from various law-enforcement agencies. *Id.* 260–61. Again, *Rock Solid* does not indicate the Justice Snyder *did* anything to assist or advise the investigating police officers. In her disposition of Lopez's post-conviction motion pursuant to N.Y.Crim. Pro. Law § 440.10, which, like the present petition, relied heavily on alleged facts and inferences drawn from *Rock Solid*, Justice Snyder stated emphatically that she "had nothing to do with writing the book nor did [she] verify or approve anything contained in it." (Pet., Ex. F at 3.)

## III. *Defense Counsel's Preparation for and Conduct at Trial*

While the gravamen of Lopez's Sixth Amendment claim is that his trial counsel failed to challenge the warrant for the Loft, Lopez makes two other arguments in support of his claim that he received ineffective assistance of counsel. First, counsel's opening statement allegedly made promises that he failed to keep – for example, that he would present evidence to show that Lopez ran a legitimate business, not a narcotics organization; that he would show that Lopez did not live on a palatial estate in Puerto Rico; and that he would present certain witnesses. (Pet.¶¶ 12, 37–54.) Second, because of counsel's alleged failure to review certain discovery materials, he "opened the door" to the elicitation of inflammatory evidence about threats ascribed to Lopez by the prosecution's chief witnesses, Bose and Barchiesi, which otherwise would not have been admitted into evidence and which prejudiced Lopez. (*Id.* ¶¶ 13, 60–81.) These negligent acts

and errors, Lopez argues, combined with counsel's failure to make a suppression motion, denied him the effective assistance of counsel guaranteed by the Sixth Amendment.

### IV. *Procedural History*

On December 13, 1988, Justice Snyder sentenced Lopez to consecutive terms of incarceration of twenty-five years to life and eight and one-third to twenty-five years. For reasons not clear from the record, it took nearly ten years to resolve Lopez's direct appeal. On November 10, 1998, the Appellate Division affirmed, *People v. Lopez*, 255 A.D.2d 147, 682 N.Y.S.2d 127 (1st Dep't 1998), and on December 28, 1998, the New York Court of Appeals denied leave to appeal. 92 N.Y.2d 1034, 684 N.Y.S.2d 499, 707 N.E.2d 454 (1998) (Bellacosa, J.). Lopez then brought a collateral attack on his conviction pursuant to N.Y.Crim. Proc. Law § 440.10. He argued, as he does here, that he received ineffective assistance of counsel and that Justice Snyder should have recused herself because of her alleged participation in the investigation culminating in Lopez's arrest. In view of the latter claim, Lopez asked Justice Snyder to recuse herself from hearing his § 440.10 motion. (Pet., Ex. C at 43.) By order of December 7, 2001, Justice Snyder found no basis to recuse herself and denied the § 440.10 motion on the merits. (*Id.,* Ex. F.) The Appellate Division denied leave to appeal that decision on February 14, 2002. (*Id.,* Ex. G.) Lopez filed the present petition for habeas corpus, raising substantially the same claims as in his § 440.10 motion,[3] on April 8, 2002.

### DISCUSSION

#### I. *Procedural Objections*

As a threshold matter, the District Attorney argues that Lopez's claims must be dismissed as procedurally defaulted and untimely because the factual bases for those claims were available to Lopez no later than 1992, and yet he waited until December 1999 to raise them. By failing to raise his present claims of ineffective assistance and judicial impropriety at an earlier stage, the District Attorney argues, Lopez forfeited them (Resp. Br. 31–32 & n. 13), and because Justice Snyder denied Lopez's § 440.10 motion as, *inter alia,* "untimely" (Pet., Ex. F at 3), her decision allegedly rests on an independent and adequate state ground that precludes federal habeas review. (Resp.Br.29–31.)

Lopez's petition raises questions of fact about events that happened nearly two decades ago. The allegedly defective warrant issued in 1985; Lopez's trial took place in 1988. Given the length of time that has passed, the Court finds the District Attorney's claim of unfair prejudice compelling. Indeed, Irving A. Anolik, Lopez's trial counsel, testifies that he does not recall ever having seen the warrant until Lopez's habeas counsel brought it to his attention (Pet., Ex. K), an assertion as difficult to credit as it is to disprove, and

---

**3.** In his original petition, Lopez also argued that Justice Snyder unconstitutionally failed to inquire into Lopez's trial counsel's alleged financial conflicts of interest or to act to protect Lopez from counsel's alleged failure to prepare adequately for trial and otherwise represent his client competently. (Pet.¶¶ 14–15.) Subsequently, Lopez abandoned that argument to the extent that he had initially urged it as a basis for relief distinct from his ineffective-assistance claim, conceding that because he had not fairly presented to the state courts the substance of this particular federal claim, *Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982), it had not been exhausted. (Aug. 16, 2002 Tr. 3–7, 48–49.) *See* 28 U.S.C. § 2254(b)(1)(A); *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Daye v. Attorney General*, 696 F.2d 186, 190–91 (2d Cir.1982).

one which makes it a relatively simple task for habeas counsel to characterize Anolik's failure to move to suppress the warrant as ineffective assistance: "Mr. Anolik must have received the warrant and either neglected to read it, or read it and refused to make the effort of drafting a motion and litigating a suppression hearing because he was dissatisfied with his financial arrangements." (Pet. Ltr. dated Oct. 9, 2002, at 1.) Furthermore, records that may have cast light on the circumstances of the warrant's issuance have been lost or misplaced. (Pet., Ex. D at 35.) In particular, the record of the warrant proceedings should have disclosed whether, as Bose once testified (Resp. Ltr. dated Oct. 30, 2002, Annex at 12), the confidential informants relied upon by Marshall restated their information under oath before Magistrate Judge Bernikow. But the Court's order unsealing that record proved unhelpful, for it cannot now be located. (Resp. Ltr. dated Dec. 3, 2002.)

■ Despite these evidentiary difficulties and the potential prejudice to respondent, the Court is constrained to overrule the District Attorney's laches and procedural default objections. With respect to procedural default, a federal court may not issue the writ where a state court's denial of a claim rests on an independent and adequate state-law ground, including failure to follow a state procedural rule requiring such a claim to be raised in a certain manner lest the defendant forfeit that claim. *Coleman v. Thompson*, 501 U.S. 722, 729–32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). But the adequacy of an alleged state procedural bar is itself a question of federal law, *Lee v. Kemna*, 534 U.S. 362, 375, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002); *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir.1999), and "a [state] procedural bar will be deemed 'adequate' only if it is based on a rule that is

'firmly established and regularly followed' by the state in question." *Id.*, quoting *Ford v. Georgia*, 498 U.S. 411, 423–24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991).

■ Here, the District Attorney argues that Justice Snyder denied Lopez's collateral claims on the independent and adequate state-law ground that Lopez failed timely to raise them. (Resp. Br. 30–31; Pet., Ex. F at 3.) N.Y.Crim. Proc. Law § 440.10(3)(a) provides:

3. Notwithstanding the provisions of subdivision one, the court may deny a motion to vacate a judgment when:

(a) Although facts in support of the ground or issue raised upon the motion could with due diligence by the defendant have readily been made to appear on the record in a manner providing adequate basis for review of such ground or issue upon an appeal from the judgment, the defendant unjustifiably failed to adduce such matter prior to sentence and the ground or issue in question was not subsequently determined upon appeal. This paragraph does not apply to a motion based upon deprivation of the right to counsel at the trial or upon failure of the trial court to advise the defendant of such right[.]

By its terms, this subsection applies neither to matters that could not have been adduced "prior to sentence" nor to "a motion based upon deprivation of the right to counsel," presumably including a motion based on ineffective assistance of counsel. The New York Court of Appeals' decision in *People v. Friedgood*, 58 N.Y.2d 467, 462 N.Y.S.2d 406, 448 N.E.2d 1317 (1983), which the District Attorney cites in support of the procedural default argument, involved claims of prosecutorial misconduct made more than three years after trial, where petitioner "failed to show that he used due diligence in adducing [facts in support of this claim] prior to sentencing."

*Id.* at 471, 462 N.Y.S.2d 406, 448 N.E.2d 1317. Facts in support of a claim of ineffective assistance of trial counsel, by contrast, generally cannot be adduced before sentence; in the usual case, as here (Pet. Reply 19), the petitioner will at that stage still be represented by trial counsel, and no record of counsel's alleged errors or omissions will be available. In general, post-judgment attacks on trial counsel's assistance should therefore be made by a motion pursuant to N.Y.Crim. Proc. Law § 440.10. *See People v. Brown,* 45 N.Y.2d 852, 853–54, 410 N.Y.S.2d 287, 382 N.E.2d 1149 (1978) ("[I]n the typical case it would be better, and in some cases essential, that an appellate attack on the effectiveness of counsel be bottomed on an evidentiary exploration by collateral or post-conviction proceeding."); *People v. Brown,* 28 N.Y.2d 282, 287, 321 N.Y.S.2d 573, 270 N.E.2d 302 (1971) (determination of ineffective assistance generally does "not lie within the compass of appellate review by a court limited to properly preserved questions of law"); *see also People v. Gilbert,* 295 A.D.2d 275, 745 N.Y.S.2d 155, 157 (1st Dep't 2002); *People v. Lemma,* 273 A.D.2d 180, 711 N.Y.S.2d 3, 3–4 (1st Dep't 2000) (both holding that ineffective assistance claims properly should be raised by a post-conviction motion pursuant to § 440.10).

Justice Snyder nonetheless denied Lopez's § 440.10 claims in part as untimely (Pet., Ex. F at 3), arguably barring habeas relief under the independent and adequate state ground doctrine. *See Coleman,* 501 U.S. at 729–30, 111 S.Ct. 2546. But her decision does not explain the legal basis for a finding of untimeliness, except to incorporate by reference the arguments made by the District Attorney in opposition to Lopez's motion. Indeed, Justice Snyder's finding consists of one line in a four-page decision that also addresses the merits of Lopez's arguments: "Second, this court agrees with the People, (see pages 33–36 [of the State's brief] ) that the defendant's motion is untimely." (Pet., F at 3.) That brief, however, fails to disclose an independent and adequate state ground on which the court's legal conclusion of untimeliness could rest. It cites *People v. Friedgood,* 58 N.Y.2d 467, 462 N.Y.S.2d 406, 448 N.E.2d 1317 (1983), which is inapposite for reasons already stated, and *People v. Jackson,* 266 A.D.2d 163, 699 N.Y.S.2d 40 (1st Dep't 1999), for the proposition that "[a] 440.10 motion may not be used to take a belated appeal on an issue that appears on the face of the record." *Id.* at 41. *Jackson* is also inapposite because, as explained above, an ineffective-assistance claim generally cannot be brought on a direct appeal based "on the face of the record."

█ █ The legal basis for Justice Snyder's finding of untimeliness is therefore unclear, and her decision addresses the merits. (Pet., Ex. F at 3.) The Appellate Division denied leave to appeal. Under *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Id.* at 263, 109 S.Ct. 1038. In applying this rule, the mere existence of, or a passing reference to, a state procedural bar does not necessarily qualify as a clear and express statement; "the state court must actually have relied on the procedural bar as an independent basis for its disposition." *Caldwell v. Mississippi,* 472 U.S. 320, 327, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); *cf. Jones v. Stinson,* 229 F.3d 112, 118 (2d Cir.2000) (mere recitation of factual predicate for procedural default, without an express finding of such default, insufficient to bar federal habeas review). While Justice Snyder de-

nied Lopez's § 440.10 petition in part as "untimely," her decision, including the legal authority and arguments incorporated by reference to the District Attorney's brief, does not cite a state ground adequate to support such a finding. Because "the last state court rendering a judgment" did not "clearly and expressly" state that its decision rested on a state procedural ground – that is, a finding that Lopez failed timely to raise his present claims under a state procedural rule "firmly established and regularly followed by the state in question," *Garcia*, 188 F.3d at 77 (internal quotation marks omitted) – the independent and adequate state ground doctrine does not bar the Court's consideration of Lopez's claims. *See Harris*, 489 U.S. at 263, 109 S.Ct. 1038.

█ The District Attorney also suggests in a footnote that the "equitable doctrine of laches applies in habeas cases" and debars the Court's consideration of Lopez's habeas petition because delays in bringing that petition "have prejudiced the state's ability to answer the petition." (Resp. Br. 32 n. 13.) Rule 9(a) of the Rules Governing Section 2254 Cases in the United States District Courts permits a district court to dismiss a habeas petition "if it appears that the state of which the respondent is an officer has been prejudiced in its ability to respond to the petition by delay in its filing." *See, e.g., Honeycutt v. Ward*, 612 F.2d 36, 41–43 (2d Cir.1979). This Rule, adopted in 1976, codified the equitable doctrine of laches, *see id.* at 41, at a time before the enactment of the Anti–Terrorism and Effective Death Penalty Act of 1996, which imposes a one-year statute of limitations on federal habeas petitions. 28 U.S.C. § 2244(d)(1). While § 2244(d)(1) and Rule 9(a) present theoretically distinct inquiries, seldom in practice will a timely-filed habeas petition be barred by the doctrine of laches, for the timeliness of a petition generally means that the petitioner filed it no more than one year after he exhausted his state court remedies, as federal law requires. *Id.* § 2254(b)(1)(A). It would hardly be equitable to penalize a petitioner for the delay caused by the federal exhaustion requirement, even where that delay arguably prejudices the state's ability to respond.

Here, the District Attorney does not dispute that under Second Circuit law, Lopez timely filed his petition within the meaning of § 2244(d)(1)(A). (Resp. Br. 30 n. 12.) Had Lopez sought to file his federal habeas petition before February 14, 2002, when the Appellate Division denied him leave to appeal Justice Snyder's adverse ruling, the petition could have been dismissed as unexhausted. True, as the State argues, Lopez could have filed a post-judgment § 440.10 motion before the Appellate Division ruled on his direct appeal (Resp.Br.31), and earlier presentation of the claims made in the present petition may have avoided prejudice to the State and facilitated resolution of some of the evidentiary issues now in dispute. But on the present record, the Court cannot make independent findings of fact that Lopez unduly delayed filing the present petition or that any such delay unfairly prejudiced the State's ability to respond to it.[4]

4. Indeed, both the Supreme Court and Congress have adopted policies that encourage or even require prisoners challenging state convictions to present their claims by means of a single petition (rather than multiple, successive petitions), which includes all federal claims, brought after all those claims have been exhausted by presentation to the state courts. *See* 28 U.S.C. § 2254(b)(1)(A); *Coleman*, 501 U.S. at 731, 111 S.Ct. 2546 (exhaustion); 28 U.S.C. § 2244(b) (constraints on successive petitions); *McCleskey v. Zant*, 499 U.S. 467, 489–93, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) (canvassing "abuse of the writ" jurisprudence that applied to successive habeas petitions before AEDPA's enactment).

## II. *The Ineffective Assistance of Counsel Claim*

### A. *Constitutional Standard*

■ The Sixth Amendment right to counsel is the right to the effective assistance of counsel. *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); *see also Evitts v. Lucey,* 469 U.S. 387, 395–96, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). To establish a violation of this right, a convicted defendant generally must show that counsel's "representation fell below an objective standard of reasonableness," and that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This is a heavy burden. *United States v. Diaz,* 176 F.3d 52, 112 (2d Cir. 1999). Where, however, counsel labored under an actual, not merely a potential, conflict of interest that adversely affected his performance, prejudice need not be demonstrated; it will be presumed. *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052; *Cuyler v. Sullivan,* 446 U.S. 335, 349–50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Winkler v. Keane,* 7 F.3d 304, 307 (2d Cir.1993); *Strouse v. Leonardo,* 928 F.2d 548, 552 (2d Cir.1991).

■ Lopez argues that the Court should apply this less burdensome standard for establishing ineffective assistance of counsel because Anolik had an actual financial conflict of interest that adversely affected his representation of Lopez. To substantiate this allegation, Lopez relies on Anolik's pretrial motion to be relieved as counsel and on excerpts from the transcript of Lopez's sentencing. Neither suffices to show an actual conflict of interest.

Two weeks before Lopez's trial, Anolik asked to be relieved as counsel because Lopez could no longer afford to pay him; according to Anolik's affidavit, the relative upon whom Lopez depended to pay his attorney's fees had died. Anolik testified that Lopez's inability to pay would make it impossible to pursue "certain essential investigative procedures," "to purchase certain essential minutes," and "to try th[e] case." (Pet., Ex. T at 1.) But counsel's mere representation that his client lacks adequate resources to pay him or to purchase services or materials he deems essential to his client's defense does not, *ipso facto,* establish a conflict of interest. The question is whether, as a consequence of such circumstances, counsel labored under an objective conflict of interest that subjectively affected his ability to represent

Lopez therefore could not have brought his federal habeas petition asserting ineffective-assistance before he had exhausted that claim, which did not occur until Justice Snyder denied his N.Y.Crim. Proc. Law § 440.10 motion on December 7, 2001, and so he did not unreasonably delay filing his *federal* petition after that first became possible. Arguably, Lopez could have expedited filing his federal habeas petition in two ways: (1) by bringing his § 440.10 motion earlier and proceeding directly to file a federal petition alleging ineffective assistance of counsel; or (2) by bringing his § 440.10 motion earlier and consolidating his appeal from its denial with his direct appeal pending in the Appellate Division. The former option would have contravened Congress's clear intent that all federal claims be brought in a single petition, and under AEDPA, prejudiced Lopez's ability subsequently to bring other federal claims in a successive petition. *See* 28 U.S.C. § 2244(b). The latter option *might* have decreased the delay, but it might just as well have further delayed the Appellate Division's resolution Lopez's direct appeal. Even if it did not, the bulk of the delay here is attributable to that direct appeal, not to any delay by Lopez in bringing his § 440.10 motion. It is doubtful whether a federal habeas petition should be dismissed for laches not because the petitioner delayed filing *it,* but because of delays attending the preceding state processes, particularly where the record does not suffice to establish that the petitioner can be faulted for such delays.

his client. *See Strouse,* 928 F.2d at 553; *see also United States v. Malpiedi,* 62 F.3d 465, 469 (2d Cir.1995) ("To prove a lapse in representation [resulting from an actual conflict of interest], a defendant must demonstrate that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.") (internal quotation marks omitted). While failure to pay attorney's fees may give rise to "some divisiveness between attorney and client," under Second Circuit law, the Court "presume[s] that counsel will continue to execute his professional and ethical duty to zealously represent his client." *United States v. O'Neil,* 118 F.3d 65, 71 (2d Cir. 1997), and hence, "failure to pay fees or an attorney's motion to withdraw for his client's failure to pay, without more," does not establish a conflict of interest. *Id.; accord, Caderno v. United States,* 256 F.3d 1213, 1218 (11th Cir.2001) (to establish an actual financial conflict of interest, defendant must show "that his counsel actively represented his own financial interest during [defendant's] trial").

Lopez's sole evidence of an actual conflict of interest consists in a few selective, extra-contextual quotations from the record alluding to a possible failure to pursue an alibi defense for "budgetary reasons." (Pet.¶ 57–58.) These do not in any way suggest that Anolik abdicated his professional duty to represent Lopez zealously because of his financial interests,[5] nor, as a matter of law, does Anolik's application to withdraw as counsel. *O'Neil,* 118 F.3d at 71. And in any event, Justice Snyder responded to Anolik's application by appointing him to represent Lopez pursuant to N.Y. County Law § 18b and assuring him that the court would pay reasonable investigation fees and other expenses necessary to the preparation of Lopez's defense. (Resp.Br.36–37.) The record is devoid of evidence to support petitioner's claim that Anolik "seemed to feel ... that his failure to discharge his responsibilities was somehow justified by his dissatisfaction with his fee." (Pet. Reply 6.) In fact, Anolik ultimately waived personal compensation for his services.[6] (Resp.Br.38.) Lopez's assertion that Anolik labored under a financial conflict of interest that caused a lapse in representation is therefore speculative at best. His ineffective assistance claim is properly appraised under the general two-prong standard set forth in *Strickland:* He must show that Anolik's performance fell below an objective standard of reasonableness, and that but for that deficient performance, the outcome of the proceedings against him would have been different.

### B. *Standard of Review on Habeas*

A federal habeas court cannot grant relief based on "any claim that was adjudi-

---

5. As the District Attorney notes, the passage immediately preceding the one Lopez quotes indicates that Anolik concluded that he could not raise an alibi defense for non-financial reasons; budgetary constraints, if any, played no role in his decision not to investigate this defense further. (Resp.Br.37.)

6. It is a curious irony that while Lopez relies almost exclusively on *Rock Solid* in his effort to establish Anolik's ineffectiveness, the book itself portrays Anolik and his representation of Lopez in salutary terms: Anolik, as *Rock Solid* tells it, was "a Harvard-educated ex-

Marine," whose courtroom manner was unfailingly "courteous and restrained" as "he presented his client's defense in measured, forceful terms, presenting an effective counterbalance to the brooding, mercurial Lopez." *Rock Solid* 277. Anolik crafted Lopez's defense around the idea that Lopez was the victim of mistaken identity, and to this end, the authors assert, vigorously and skillfully cross-examined the battery of police officers who testified for the prosecution. *See id.* 277–80.

cated on the merits in State court proceedings unless the adjudication of the claim ... resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (Opinion of O'Connor, J.). The District Attorney observes, and Lopez does not dispute, that Justice Snyder "adjudicated" Lopez's ineffective assistance of counsel claim "on the merits." (Resp.Br.35–36.)

While Justice Snyder correctly cited *Strickland* as governing law (Pet., Ex. F. at 2), her opinion appears to apply New York's distinct standard for assessing ineffective-assistance claims. (*Id.*) The New York constitutional standard, *see People v. Baldi*, 54 N.Y.2d 137, 147, 444 N.Y.S.2d 893, 429 N.E.2d 400 (1981), however, is not "contrary to" the federal constitutional standard set forth in *Strickland.*[7] *Eze v. Senkowski*, 321 F.3d 110, 122–24 (2003). A New York court therefore "adjudicates" a federal ineffective-assistance claim "on the merits" if it applies or simply cites *Baldi*. *See Eze*, 321 F.3d

at 123–24; *Lindstadt v. Keane*, 239 F.3d 191, 198 (2d Cir.2001) (citation to *Baldi*, without discussion, held to be an "adjudication on the merits" of petitioner's federal ineffective-assistance claim for purposes of § 2254(d)). Justice Snyder's opinion, which cites *Strickland* and *Baldi* and applies the latter to reject Lopez's ineffective-assistance claim (Pet., Ex. F at 2–3), thus plainly qualifies as an adjudication on the merits. Accordingly, the Court may not grant Lopez's petition unless the state court's decision disposing of this claim unreasonably applied *Strickland* to the facts of Lopez's case. *See Williams*, 529 U.S. at 413, 120 S.Ct. 1495 (Opinion of O'Connor, J.).

Justice Snyder denied Lopez's ineffective-assistance claim on two grounds, finding that neither prong of *Strickland* had been established. She held, first, that Anolik's failure to move to suppress the search warrant for the Loft did not prejudice Lopez because "a motion to controvert the warrant would have failed"; and second, that "objective[ly] reasonable strategies exist to explain why defense counsel would have chosen not to controvert the search warrant."[8] (Pet., Ex. F at 3.) To

---

7. According to *Williams*, "[u]nder the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by th[e] [Supreme] Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." 529 U.S. at 412–13, 120 S.Ct. 1495. The Second Circuit has held that *Baldi's* conclusion on the question of law posed by an ineffective assistance of counsel claim is not "opposite to that reached by" the Supreme Court in *Strickland*. *Lindstadt v. Keane*, 239 F.3d 191, 198 (2d Cir.2001) ("The [*Baldi*] standard ... is not 'diametrically different, opposite in character or nature, or mutually opposed' to the standard articulated in *Strickland*."), quoting *Williams*, 529 U.S. at 405, 120 S.Ct. 1495 (Opinion of O'Connor, J.).

8. Beyond citing and apparently incorporating by reference relevant sections of the District Attorney's brief, Justice Snyder did not explain her reasons for these conclusions. (Pet., Ex. F at 3.) The Second Circuit appeared to express wholesale disapproval of this practice on the part of federal district courts. *See Rudenko v. Costello*, 286 F.3d 51 (2d Cir.2002), *withdrawn*, 322 F.3d 168 (2d Cir.2003). Since then, however, the Circuit has retreated to the view that *"in some cases* a district court's adoption of the ... State's contentions opposing ... habeas petitions does not provide this Court with sufficient information to conduct a meaningful appellate review." *Id.* at 170 (emphasis added). But these strictures do not apply, *mutatis mutandis*, to the degree of deference owed under 28 U.S.C. § 2254(d) to the state court's

establish his entitlement to a writ of habeas corpus based on his ineffective-assistance claim, Lopez must demonstrate that *both* of these determinations reflect unreasonable applications of *Strickland.*

Lopez contends that Anolik rendered ineffective assistance of counsel principally because he failed to move to suppress evidence obtained pursuant to the search warrant for the Loft based on "facial deficiencies" in the warrant affidavit that allegedly would have been "self-evident to any competent criminal attorney." (Pet. ¶ 29.) Had Anolik made that motion, Lopez argues, it would have succeeded, in which event the cocaine recovered from the Loft could not have been introduced at his trial, and he therefore would not have been convicted for first-degree possession of a controlled substance.

There is a considerable irony to this claim. Fundamentally, Lopez argues that the critical evidence underlying the most serious count of conviction should have been excluded as the fruit of unlawful police conduct. Yet he does not, and cannot, claim directly that the search, or the consequent admission of evidence, violated his federal constitutional rights, for were Lopez to base his claim on the Fourth Amendment's prohibition of unreasonable searches and seizures, it would not be cognizable on habeas. *See Stone v. Powell,* 428 U.S. 465, 481, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) ("[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."). Moreover, the alleged illegality of the search is wholly a product of state, not federal, law. As discussed in more detail below, Lopez does not – and again, cannot – argue that the warrant authorizing the police to search the Loft violated the Fourth Amendment, for the warrant application sets forth sufficient facts from which a reasonable magistrate, applying the flexible federal standard articulated in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), could find probable cause. Rather, the motion Lopez argues should have been made would have relied on New York State law, which continues to impose special restrictions, long abandoned as a matter of federal law, on the use of information from confidential informants in assessing probable cause. Lopez's ineffective-assistance claim thus becomes a vehicle for asking this Court to adjudicate, on federal habeas review (where, of course, claims based on state law are unavailable as grounds for relief), a search-and-seizure motion based entirely on state law, even though a challenge to the same search based on federal constitutional principles would be both non-cognizable and meritless.

judgment in this case. First, the Second Circuit has held that federal courts must defer under § 2254(d) to state court decisions on the merits, however cryptic. *See Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d Cir.2001). While the Court of Appeals enjoys supervisory authority over federal district courts, neither it nor this Court has a comparable power to instruct state courts how they should write opinions. Second, Justice Snyder's opinion does not suffer from the ambiguities that troubled the Court of Appeals in *Rudenko, Mi-randa v. Bennett,* 322 F.3d 171 (2d Cir.2003), and *Gandarilla v. Artuz,* 322 F.3d 182 (2d Cir.2003). The opinion makes clear, albeit by reference to the District Attorney's brief, the grounds on which the court's conclusions rest, and the portions of that brief incorporated by reference are neither contradictory nor ambiguous. The brief sets forth clear, straightforward legal positions that Justice Snyder adopted as the basis for her own independent judgment of the merits of Lopez's claims.

■ Notwithstanding these considerations, Lopez's ineffective-assistance claim based on the failure of trial counsel to move to suppress the search warrant for the Loft remains cognizable on federal habeas. The Sixth Amendment confers an independent right to the assistance of counsel in criminal cases. *See Kimmelman v. Morrison,* 477 U.S. 365, 374, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (rejecting "petitioner's perception of the identity between respondent's Fourth and Sixth Amendment claims" and observing that "[w]hile defense counsel's failure to make a timely suppression motion is the primary manifestation of incompetence and source of prejudice ..., the two claims are nonetheless distinct, both in nature and in the requisite elements of proof"). For this reason, the "restrictions on federal habeas review" announced in *Stone* do not apply to Sixth Amendment claims of ineffective assistance of counsel predicated on counsel's "failure to file a timely motion to suppress evidence allegedly obtained in violation of the Fourth Amendment." *Id.* at 368, 106 S.Ct. 2574. Moreover, Lopez's Sixth Amendment claim remains cognizable on habeas whether the underlying suppression motion that counsel failed to make would have been based on federal or state law. *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994) ("The claim whose omission forms the basis of an ineffective assistance claim may be either a federal-law or a state-law claim, so long as the failure to raise the state ... claim fell outside the wide range of professionally competent assistance.") (internal quotation marks omitted); *Frazier v. Kelly,* 112 F.Supp.2d 253, 257 (W.D.N.Y.1999). The questions therefore remain whether Lopez's trial counsel's performance "fell below an objective standard of reasonableness," *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052, and whether "but for [that failure], the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.

In the context of a Fourth Amendment or cognate state-law claim, *Strickland* requires an analysis of the merits of the suppression motion;[9] if the motion would have prevailed, the Court must then ask whether "the verdict would have been different absent the excludable evidence." *Kimmelman,* 477 U.S. at 375, 106 S.Ct. 2574. Hence, insofar as Lopez bases his ineffective-assistance claim on counsel's failure to move to suppress, he can prevail only if (1) a competent attorney would have moved to suppress the evidence recovered from the Loft, (2) that motion would have prevailed, and (3) the outcome of Lopez's trial would for that reason have differed.

Resolution of these issues requires a careful analysis of state law because the adequacy of counsel's performance, and the consequences of any dereliction – that is, the merits of Lopez's Sixth Amendment claim – depend on the substance of state search-and-seizure law. While this does not mean, as noted, that Lopez has not advanced a cognizable *federal* claim, it does mean that a federal court's deference to the state court's conclusions is doubly reinforced. By arguing that the state court unreasonably applied *Strickland,* Lopez asks this Court not only to reject the state court's application of Supreme Court

---

9. Even though a federal magistrate issued the search warrant for the Loft, the Court must examine the merits of the potential suppression motion under New York, not federal, law, for the question is whether a reasonably competent lawyer would have made such a motion under the law governing at the time of Lopez's trial. New York courts apply New York law to assess the validity of a warrant issued by a federal magistrate. *People v. Griminger,* 71 N.Y.2d 635, 641, 529 N.Y.S.2d 55, 524 N.E.2d 409 (1988).

precedent, which it is equally sworn to uphold, *Robb v. Connolly,* 111 U.S. 624, 637, 4 S.Ct. 544, 28 L.Ed. 542 (1884), but also to reject the state court's conclusions on questions of *state* law, about which it possesses far greater expertise.

### C. *Lopez's Projected Motion*

#### 1. *New York Law on Probable Cause*

 New York, like federal, law limits review of the validity of a search warrant to an analysis of "the sufficiency of what is found within the four corners of the underlying affidavit." *People v. Roberts,* 195 A.D.2d 1018, 600 N.Y.S.2d 582, 583 (4th Dep't 1993), quoting *United States v. Taylor,* 716 F.2d 701, 705 (9th Cir.1983); *see also People v. Nieves,* 36 N.Y.2d 396, 402, 369 N.Y.S.2d 50, 330 N.E.2d 26 (1975) (facial validity of warrant dependent on "facts and circumstances … known to the issuing Magistrate"). A warrant is valid if it describes the places to be searched or items to be seized and is supported by probable cause. *Id.* at 401–02, 369 N.Y.S.2d 50, 330 N.E.2d 26. While Article I, Section 12 of the New York Constitution protects citizens against unreasonable searches and seizures in language that repeats verbatim that of the Fourth Amendment to the United States Constitution,[10] the New York Court of Appeals has construed the State Constitution's language to require a higher threshold showing of probable cause than federal law requires.

In *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court held that because "probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even use-

fully, reduced to a neat set of legal rules," courts should apply a totality-of-the-circumstances analysis in order to evaluate the sufficiency of a warrant affidavit. *Id.* at 232, 103 S.Ct. 2317. Where a warrant relies on tips from an anonymous informant, his veracity, reliability, and basis of knowledge should inform the court's probable cause determination. But "a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.* at 233, 103 S.Ct. 2317. New York, by contrast, continues to apply the pre-*Gates* standard for assessing probable cause based on tips from an anonymous informant, a standard identified with the Supreme Court's decisions in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), both of which *Gates* overruled. In *People v. Griminger,* 71 N.Y.2d 635, 529 N.Y.S.2d 55, 524 N.E.2d 409 (1988), the New York Court of Appeals found that *Gates* did not offer "a sufficient measure of protection" and therefore held "that, as a matter of State constitutional law, the *Aguilar–Spinelli* two-prong test should [continue to] be applied in determining whether there is a sufficient factual predicate upon which to issue a search warrant." *Id.* at 639, 529 N.Y.S.2d 55, 524 N.E.2d 409.

 *Aguilar–Spinelli* requires that a warrant application set forth facts sufficient to establish, first, the veracity of the informant's tip – that is, some reason to credit it – and second, the basis of his or her knowledge. "The separate basis of knowledge and veracity requirements of

---

10. Each provides: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no war- rants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

*Aguilar/Spinelli* are analytically independent and each must be satisfied." *People v. DiFalco,* 80 N.Y.2d 693, 697, 594 N.Y.S.2d 679, 610 N.E.2d 352 (1993). Unlike under *Gates,* 462 U.S. at 233, 103 S.Ct. 2317, a strong showing in one area cannot compensate for a deficiency in the other. The first prong of *Aguilar–Spinelli* can be satisfied in two ways: by establishing *either* the *informant's* reliability *or* the reliability of the *particular information* at issue. *DiFalco,* 80 N.Y.2d at 697, 594 N.Y.S.2d 679, 610 N.E.2d 352. An informant's reliability can be established by, among other indicia, "past instances of reliability, that the informant provided the information under oath, [or] that the information provided was contrary to the informant's penal interest." *People v. Burks,* 134 A.D.2d 604, 521 N.Y.S.2d 718, 719 (2d Dep't 1987); *see also DiFalco,* 80 N.Y.2d at 697 & n. 2, 594 N.Y.S.2d 679, 610 N.E.2d 352. The reliability of particular information, however, must be shown by "independent verification of sufficient details of that information." *Id.* at 697, 594 N.Y.S.2d 679, 610 N.E.2d 352. While such details need not be inherently "criminal in nature," neither may they be "merely peripheral to the reported criminal scheme; they must fit within the informant's story of the contemplated crime as ·activities which are significant and essential to carrying it out." *Id.* at 699, 594 N.Y.S.2d 679, 610 N.E.2d 352.

*Aguilar–Spinelli's* second prong, basis of knowledge, likewise may be satisfied in two ways: First, it suffices if the informant personally observed or participated in the criminal activity at issue, for those circumstances diminish the concern that a search or seizure may proceed based on "knowledge" that turns out to be mere rumor or an effort to frame the person implicated by the informant's tip. *See People v. Elwell,* 50 N.Y.2d 231, 234–

35, 428 N.Y.S.2d 655, 406 N.E.2d 471 (1980). But under New York law, where the informant does not reveal the basis of his or her knowledge, police observation or other corroborative investigation can only compensate for that deficiency if it establishes "sufficient details suggestive of or directly related to criminal activity." *Id.* at 234, 428 N.Y.S.2d 655, 406 N.E.2d 471. Unlike the reliability standard, that is, the details confirmed by the police to substantiate an informant's basis of knowledge must strongly imply criminal activity.

### 2. The Reasonableness of Counsel's Failure to Move to Suppress the Warrant

Whether Lopez's trial counsel's failure to move to suppress the warrant for the Loft fell below an objective standard of reasonableness, *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052, depends on how a reasonable New York practitioner would have assessed the potential risks and benefits of such a motion, including its potential merits and possible strategic reasons to forego ·it. Bearing in mind the principles of New York law articulated above and evaluating, for the moment, only "the sufficiency of what is found within the four corners of the underlying affidavit," *Roberts,* 600 N.Y.S.2d at 583 (internal quotation marks omitted), it is immediately apparent that, on its face, the warrant affidavit for the Loft satisfies *Aguilar–Spinelli's* "basis of knowledge" requirement. Each of the two confidential informants cited in the affidavit report that they personally observed cocaine in the Loft. (Pet., Ex. I ¶¶ 1, 4.)

With regard to the "reliability" requirement, however, the affidavit appears facially defective. It does not state that either informant has a "track-record," *DiFalco,* 80 N.Y.2d at 697 n. 2, 594 N.Y.S.2d 679, 610 N.E.2d 352, that is, a history of provid-

ing truthful information to the police. Nor does it appear that the confidential informants made any statements against their penal interest. While each claimed to have observed cocaine in the Loft, to have had "contacts" with members of the alleged narcotics organization, and to have been solicited by those members to join it, neither admitted to perpetrating any criminal activity themselves. Finally, the affidavit does not indicate that the informants made their statements under oath. Because none of the traditional indicia of informant reliability appear on the face of the affidavit, the question is whether it provided to the issuing magistrate facts disclosing *independent,* corroborative police work sufficient to verify the particular information furnished by the informants. *See id.* at 697, 594 N.Y.S.2d 679, 610 N.E.2d 352. It seems doubtful that it did.

The warrant states in a conclusory fashion that the affiant learned "through independent investigation" that one Raul Garcia Feliciano had been charged with a felony murder "related to narcotics trafficking." (Pet., Ex. I ¶ 4.) It does not specify in what that investigation consisted. Nor does not it indicate that the narcotics trafficking had any relation to the Loft or the narcotics organization alleged to be headquartered there. While police officers observed Feliciano, whom they knew to be a narcotics dealer, and his apparent comrades leave 405 Greenwich Street under arguably suspicious circumstances, it is not clear how these details corroborate the tips supplied by the two confidential informants. Feliciano had no known relationship to Lopez or the Rock Organization, and the affidavit does not say that Feliciano departed from the specific apartment in the multi-unit building identified by either of the anonymous informants relied on in the affidavit. The details about Feliciano therefore appear to be, at best, "merely peripheral to

the reported criminal scheme," for they do not "fit within the informant's story of the contemplated crime as activities which are significant and essential to carrying it out." *DiFalco,* 80 N.Y.2d at 699, 594 N.Y.S.2d 679, 610 N.E.2d 352.

The only other detail that might be thought to corroborate the information furnished by the confidential informants appears in paragraph three of Marshall's affidavit, which says that an undercover police officer bought cocaine in front of 507 East 11th Street. (Pet., Ex. I ¶ 3.) But the affidavit does not say that the cocaine bore the label "Solid," as one informant suggested it would (*id.*), and the mere fact that an undercover officer purchased some cocaine from a location where, according to the informants, the narcotics organization headquartered at the Loft also sold its particular brand of cocaine provides little, if any, corroboration of the informants' allegations about the Loft. *See People v. Feanny,* 177 A.D.2d 859, 576 N.Y.S.2d 628, 629–30 (3d Dep't 1991); *Burks,* 521 N.Y.S.2d at 720.

The District Attorney argues, however, that as a matter of law, the reliability requirement of *Aguilar–Spinelli* is met where, as here, the affidavit contains information provided by *two* informants, and each informant corroborates the other. (Resp. Br. 41.) Neither party has been able to cite any New York legal authority for or against this proposition. Lopez notes that the California Supreme Court rejected it in the context of a warrantless arrest. *People v. Fein,* 4 Cal.3d 747, 94 Cal.Rptr. 607, 484 P.2d 583, 587 (1971) ("Although there may be circumstances where corroborative information from separate, unrelated sources will thereby establish its credibility, nevertheless in the instant case the record fails to show what information each informer furnished the officers, or whether the information was

furnished independently by each informer."). The District Attorney responds that several Eighth Circuit decisions hold to the contrary (Resp. Ltr. dated Sept. 27, 2002, at 3), although it is far from clear that these cases establish the proposition that the existence of two anonymous informants who corroborate one another, without more, establishes reliability under *Aguilar–Spinelli*.[11] In *United States v. McGlynn*, 671 F.2d 1140 (8th Cir.1982), the court held that "a tip that is insufficient under *Aguilar* may nevertheless serve as the basis for a probable cause determination if the reliability of the tip is corroborated by another independent source, or if the accuracy of the information is borne out by independent corroboration by the authorities." *Id.* at 1145. The warrant affidavit for the Loft does not indicate the independence of the confidential informants; by the same token, it does not contain information that would give a magistrate any reason to the conclude that they were *not* independent. Finally, as noted earlier, the warrant affidavit contains few, if any, facts demonstrating independent corroboration by the authorities, except for the conclusory statement that the police confirmed the informants' tips by "independent investigation."

█ Under these circumstances, the merits of a hypothetical suppression motion would hardly have been clear to a reasonably competent New York lawyer at the time of Lopez's trial. *See Kimmelman*, 477 U.S. at 384, 106 S.Ct. 2574 ("The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances."). But the question, at this stage of the analysis, is not whether a suppression motion would have succeeded, or even whether it *necessarily* should have been made; it is whether counsel's failure to investigate the option, consider its strategic merits and demerits, and then make an informed decision about it fell below an objective standard of reasonableness. Enough has been said to establish that it did, because "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. A reasonably competent New York attorney would have, at a minimum, investigated the warrant further in light of the affidavit's potential defects under New York law and considered moving to suppress it. *See Kimmelman*, 477 U.S. at 384–85, 106 S.Ct. 2574 (finding counsel's failure to file a timely suppression motion unreasonable under *Strickland* where, far from making a strategic decision not to move to suppress after investigation, counsel remained unaware of the search at issue because he failed to request pretrial discovery).

Anolik specifically denies that he made a strategic decision to forego a motion to suppress the warrant for the Loft. (Pet., Ex. K ¶ 9.) He submits that he never saw the warrant before habeas counsel brought it to his attention on October 8, 1999. (Pet., Ex. K ¶¶ 5, 7.) Because the possession charge, which carried the more severe sentence, depended fundamentally on evidence procured pursuant to the warrant, a

---

11. In *United States v. McGlynn*, 671 F.2d 1140 (8th Cir.1982), one of the informants had previously supplied information leading to an arrest and conviction. *Id.* at 1145. *United States v. Reiner Ramos*, 818 F.2d 1392 (8th Cir.1987), involved two informants whose tips not only corroborated one another, but were verified by independent investiga-tion. *Id.* at 1397–98. *United States v. Reivich*, 793 F.2d 957 (8th Cir.1986), involved *known* informants who also made statements against penal interest. *Id.* at 959. It should also be noted that, with the exception of *McGlynn*, these cases were decided after *Gates* and thus not under the *Aguilar–Spinelli* standard.

reasonably competent attorney would have obtained and reviewed it. No evidence suggests, and Lopez does not allege, that the District Attorney wrongfully withheld the warrant from Anolik.[12] Therefore, either Anolik did not review the warrant, which certainly falls below an objective standard of reasonableness, or he reviewed it in such a cursory or negligent fashion that he failed to notice any reason to investigate a potential suppression motion under New York law, which also falls below an objective standard of reasonableness.

Reasonable New York lawyers might differ on the merits or strategic advisability of a motion to suppress.[13] But failure to review the warrant and consider such a motion under New York law unquestionably falls below an objective standard of reasonableness. Insofar as Justice Snyder denied Lopez's ineffective-assistance claim on the ground that "objective[ly] reasonable strategies exist to explain why defense counsel would have chosen not to controvert the warrant" (Pet., Ex. F at 3), her decision unreasonably applied *Strickland*, for in this case the inquiry under federal law is not whether a hypothetical, reasonably competent attorney may have had a strategic reason not to make a mo-

---

**12.** To the contrary, the parties agree that Anolik must have seen the warrant. Lopez asserts in his petition that all of the information necessary to challenge the warrant "was available at the time of [his] trial" and would have been uncovered if only Anolik had investigated diligently. (Pet. ¶¶ 35, 91.) And to the extent that Anolik's affidavit suggests that the District Attorney never disclosed the warrant to him at the time of trial, habeas counsel characterizes it as "self-serving and false. The warrant was frequently mentioned at trial, and any competent attorney who had not received it would have complained loudly." (Pet. Ltr. dated Oct. 9, 2002, at 1.) The District Attorney explicitly agrees with this assessment and affirmatively represents that the prosecution did disclose the warrant to defense counsel before Lopez's trial. (Resp.Br.38.)

**13.** Anolik, an experienced New York criminal lawyer, asserts that had he reviewed the warrant, he would have moved to suppress evidence seized pursuant to it. (*Id.* ¶¶ 8–9.) But the District Attorney contends that Lopez's trial counsel may have made a strategic decision not to challenge the warrant because a suppression motion would have required Lopez to concede his ownership of the Loft in order to establish that he had a legitimate expectation of privacy there, that is, standing to challenge the search, *People v. Carter*, 86 N.Y.2d 721, 722–23, 631 N.Y.S.2d 116, 655 N.E.2d 157 (1995); and that concession could have been used to impeach him had he later testified at trial that others had placed his name on the Loft's lease without his permission. (Resp.Br.39.) Lopez responds that un-

der New York law, he could have relied on the State's own evidence to establish standing, without conceding his ownership of the Loft. (Pet. Reply 17.) *See People v. Ramirez-Portoreal*, 88 N.Y.2d 99, 109, 643 N.Y.S.2d 502, 666 N.E.2d 207 (1996); *People v. Gonzalez*, 68 N.Y.2d 950, 950, 510 N.Y.S.2d 86, 502 N.E.2d 1001 (1986). The Court need not resolve this issue of New York law. Under *Strickland*, the question is not whether a hypothetical, reasonably competent attorney may have made the strategic decision to forego a potentially meritorious suppression motion; it is whether trial counsel actually investigated and made such a strategic decision. *See Kimmelman*, 477 U.S. at 384–85, 106 S.Ct. 2574. The existence of a hypothetical reason why a lawyer may have chosen not to controvert the warrant for the Loft under the circumstances does not obviate counsel's "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. This point may be somewhat academic, however. While hypothetical tactical reasons to refrain from filing the motion are not relevant to assessing the performance of an attorney who failed even to consider making such a motion, those reasons would be relevant to a determination of prejudice. If a competent New York lawyer who *had* considered the merits of the suppression motion would have refrained from making it for sound tactical reasons, then the defendant could not establish prejudice under *Strickland*.

tion to suppress; it is whether Lopez's counsel in fact neglected his "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052; *see also Kimmelman,* 477 U.S. at 384–85, 106 S.Ct. 2574.[14] Because counsel's performance in this regard fell below an objectively reasonable standard, Lopez has met the first requirement of the standard articulated in *Strickland.* The Court must therefore examine the second, whether counsel's deficient performance prejudiced Lopez.

### 3. *Potential Prejudice Due to Counsel's Failure to Make a Suppression Motion*

At the level of prejudice, the Court must determine whether the result of Lopez's criminal proceedings would have differed "but for counsel's unprofessional errors." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. This counterfactual analysis is particularly complicated here for two reasons. First, as noted, the facial sufficiency of the warrant under New York law is unclear: No

New York case holds either that two untested, anonymous informants can or cannot corroborate one another for purposes of establishing reliability under *Aguilar–Spinelli.* Precedents from other jurisdictions, even assuming that New York would follow them, are inconclusive.

 Second, it not clear how a New York court would proceed if faced with a motion to suppress a warrant validly issued by a federal magistrate pursuant to federal law.[15] On the one hand, *Griminger,* 71 N.Y.2d at 641, 529 N.Y.S.2d 55, 524 N.E.2d 409, confirms that a New York court trying a defendant for crimes defined by the New York Penal Law must apply *Aguilar–Spinelli* to a motion to suppress evidence seized pursuant to a search warrant issued by a federal magistrate. This makes sense; otherwise, New York police officers could circumvent New York search-and-seizure law by bringing warrants of questionable validity under *Aguilar–Spinelli* to a federal magistrate, who would apply *Gates,* without fear that a

---

**14.** In opposition to Lopez's N.Y.Crim. Proc. Law § 440.10 motion, the District Attorney cited *People v. Satterfield,* 66 N.Y.2d 796, 497 N.Y.S.2d 903, 488 N.E.2d 834 (1985), where the New York Court of Appeals said that "counsel's subjective reasons for his choice of strategy *in this case* were immaterial," because "[v]iewed objectively, the transcript and the submissions reveal the existence of a trial strategy that might well have been pursued by a reasonably competent attorney." *Id.* at 799, 497 N.Y.S.2d 903, 488 N.E.2d 834 (emphasis added). (Pet., Ex. D at 44.) Read in its factual context, this quotation does not suggest that under New York's ineffective-assistance standard, "[a] trial lawyer's subjective evaluation of his conduct at trial is immaterial." (*Id.*) In *Satterfield,* the attorney, whose alleged ineffectiveness consisted in declining to recall a witness to solicit impeachment evidence, *see* 66 N.Y.2d at 797–98, 497 N.Y.S.2d 903, 488 N.E.2d 834, proffered three strategic reasons for his decision. *Id.* at 798, 497 N.Y.S.2d 903, 488 N.E.2d 834. The

court held that because the trial record disclosed an objectively reasonable strategy, the defendant enjoyed no entitlement to a hearing "to probe the actual reasons in the mind of trial counsel." *Id.* at 799, 497 N.Y.S.2d 903, 488 N.E.2d 834. And in any event, *Satterfield,* decided under New York law, does not control. Lopez alleges a violation of his federal right to the effective assistance of counsel under the Sixth Amendment, which remains, of course, a matter of federal law.

**15.** Even if the police acted in objective good faith in executing a facially valid federal warrant, *see United States v. Leon,* 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), such good faith would not preclude suppression of the evidence because New York, as a matter of state constitutional law, does not recognize a good-faith exception to its exclusionary rule. *People v. Bigelow,* 66 N.Y.2d 417, 427, 497 N.Y.S.2d 630, 488 N.E.2d 451 (1985).

state court would later suppress evidence seized pursuant to those warrants. On the other hand, it would seem odd to suppress evidence seized under a warrant validly issued by a federal magistrate applying federal law where law-enforcement agents could show that they possessed sufficient evidence to establish probable cause under the more stringent New York standard and that such evidence could have been presented to the magistrate had it been required. In that circumstance a New York court might well afford the State an opportunity to establish that even if the warrant is facially insufficient under *Agui-lar–Spinelli*, the State could have established probable cause under that more structured standard.[16]

 It remains Lopez's burden, however, to establish prejudice under *Strickland*. To do that, he must demonstrate that a suppression motion would have succeeded.[17] Otherwise, trial counsel's failure to make that motion did not prejudice him. Moreover, as noted in section II(B), Lopez's burden on habeas is even higher, for the state court, applying New York law, held that "a motion to controvert the warrant would have failed." (Pet., Ex. F at 3.)

16. New York law provides a procedure that could be used for this purpose. Under *People v. Darden*, 34 N.Y.2d 177, 356 N.Y.S.2d 582, 313 N.E.2d 49 (1974), "where there is insufficient evidence to establish probable cause apart from the testimony of the arresting officer as to communications received from an informer, when the issue of the identity of the informer is raised at the suppression hearing, ... the suppression Judge [should] conduct an [i]n camera inquiry." *Id.* at 181, 356 N.Y.S.2d 582, 313 N.E.2d 49. The prosecution must produce the informant for judicial interrogation, and while neither the defendant nor his counsel may be present, counsel must be afforded the opportunity "to submit in writing any questions which he may desire the Judge to put to the informer." *Id.*

The parties vigorously dispute what information a *Darden* hearing would have brought to light. Lopez, relying principally on *Rock Solid*, contends that a *Darden* hearing would have disclosed that far from being independent, the two confidential informants were Garcia and Martinez (a/k/a "Blondie" and "Juahito"), a married couple that sold cocaine, *see Rock Solid* 32; that the police interviewed them together, not separately; and that neither in fact *observed* cocaine in the Loft. (Pet. Reply 15–16.) This information, according to habeas counsel, would have uncovered police misconduct, including falsification of information and misleading omissions, requiring a further hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

The District Attorney agrees that the confidential informants were Garcia and Martinez (Resp. Ltr. dated Oct. 30, 2002, at 1), but argues that a *Darden* hearing would have bolstered, not eroded, probable cause. A *Darden* hearing in the related prosecution of Lopez' brother Eduardo shows that the police brought the informants personally before the federal magistrate, at which time they reaffirmed their information under oath. (*Id.*, Annex 12.) The minutes of that *Darden* hearing also reveal additional information about Garcia and Martinez that arguably supports the sufficiency of probable cause to search the Loft. Bose testified, for example, about independent police work that he performed to corroborate some of the details supplied by Garcia. (*See, e.g., id.* 12–13.) He also testified that the police interviewed Garcia and Martinez separately in the first instance. (*Id.* 18.)

17. The District Attorney also contends that tactical considerations would have led a competent New York attorney who considered making a suppression motion to forego it, given the risk that an unsuccessful motion would have further incriminated Lopez. *See* note 13, *supra*. The Court need not, however, decide this issue, which also depends on complex questions of New York law. Because, as explained below, the state court's finding that the motion would have failed is not an unreasonable application of Supreme Court precedent, the Court assumes without deciding that a competent New York lawyer would have made the motion, and proceeds directly to the question whether such a motion would have succeeded.

Because that court adjudicated Lopez's Sixth Amendment claim on the merits, to qualify for habeas relief, Lopez must establish that its determination is not merely incorrect, but an unreasonable application of Supreme Court precedent.

On this record, that burden is insurmountable. The success or failure of the motion at issue, and hence the existence or non-existence of prejudice under *Strickland,* turns entirely on questions of state, not federal, law. Justice Snyder held that as a matter of state law, "a motion to controvert the warrant would have failed." (Pet., Ex. F at 3.) No authoritative state precedent requires the rejection of the District Attorney's argument, which the state court accepted and incorporated by reference, that the reliability prong of *Aguilar–Spinelli* can be satisfied by two confidential informants who corroborate one another, whether or not they know each other. It cannot be an unreasonable application of federal law, as embodied in Supreme Court precedent, for a state court to adopt a particular answer to an unsettled question of state law. Yet to find that Lopez has established prejudice under *Strickland* would require the Court to substitute its own judgment for that of the state court on an unsettled question of purely state law. Lopez therefore cannot establish that had trial counsel made a suppression motion, "the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. He cannot, that is, show that the state court's explicit determination that the result of the proceeding would have been the same is an unreasonable application of the prejudice prong of *Strickland.*

D. *The Reasonableness of Counsel's Trial Preparation and Performance*

 Lopez's remaining ineffective-assistance allegations can be dealt with more briefly, for they do not withstand scrutiny under the first prong of *Strickland.* First, Lopez complains that trial counsel made promises in his opening statement that he failed to keep – in particular, that he did not produce certain witnesses or pursue certain allegedly promising defenses. Second, he argues that counsel's cross-examination of Bose "opened the door" to prejudicial testimony about evidence of incendiary threats ascribed to Lopez. Such errors, if they were errors, may be the basis for an ineffective assistance claim if they arose from counsel's failure to prepare for trial or abdication of the duty to provide vigorous representation. *See Pavel v. Hollins,* 261 F.3d 210, 216–19 (2d Cir.2001). But the District Attorney rightly points out that the record as a whole shows that Anolik prepared for trial and pursued a coherent, if ultimately unsuccessful, defense strategy. (Resp.Br.44–45.) Absent a failure of preparation or abdication of the duty of representation, decisions to call or not to call witnesses remain within the discretion of defense counsel. *United States v. Schmidt,* 105 F.3d 82, 90 (2d Cir.1997) (observing that "the tactical decision of whether to call specific witnesses – even ones that might offer exculpatory evidence – is ordinarily not viewed as a lapse in professional representation"); *United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir.1987).

 Equally, "[d]ecisions whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature." *Id.* To be sure, in hindsight, Anolik's vigorous cross-examination of Bose, which elicited certain incendiary threats ascribed to Lopez, almost certainly diminished the jury's sympathy, such as it may have been, for Lopez. But hindsight is notoriously lucid. The Court

cannot say – on the basis of *ex post facto* affidavits purporting to demonstrate the existence of potential alternative defense strategies or witnesses who may have been, but were not, called to testify (Pet., Exs.O, S) – that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

### III. *Allegations of Judicial Impropriety*

█ Lopez's second claim, that Justice Snyder should have recused herself because of her alleged participation in certain pretrial activities, is utterly without support in the record. Even were it cognizable evidence, which it is not, *Rock Solid* does not suggest that Justice Snyder participated in the investigation of Lopez's activities, still less that in "the two years leading up to Lopez's arrest, [Bose and Barchiesi] consulted Judge Snyder about this investigation, and she gave them advice and provided assistance to help them build their case." (Pet.¶ 16.) As noted, the book only indicates that Bose and Barchiesi informed Justice Snyder of their decision to fly to Puerto Rico in their personal capacities to arrest Lopez, and that upon hearing of Lopez's arrest, she "responded without hesitation." *Rock Solid* 260.

Justice Snyder noted that she had no knowledge of the contents of the book and did not approve or verify any of its alleged facts. (Pet., Ex. F at 3.) Nothing in the book states or even implies that Bose and Barchiesi consulted Justice Snyder or enlisted her assistance. On its face, the alleged notice to Justice Snyder of the Puerto Rico trip does not amount to "consultation." To the contrary, the officers' account indicates that they in some way notified of their intention precisely those people who "did not have the will or the

authority to sabotage their plans," *Rock Solid* 238 – a kind of "blow-by" intended to provide colorable cover if the officers were later accused of having taken action on their own, which is, in fact, what they did. No judge would be expected to respond to such a "notice," nothing in *Rock Solid* suggests that Justice Snyder did, and indeed the entire exercise was predicated on the officers' expectation that she would not. As for the notification of Lopez's arrest, it is neither surprising nor remarkable that government officials would notify the presiding judge in a case that a fugitive defendant had been apprehended. Whatever the officers may have hoped that such notification might achieve by way of resolving their jurisdictional battles with other agencies, nothing in the book – let alone any actual evidence – provides any reason to believe that Justice Snyder took any improper action, or any action at all, in response to the alleged call. That "wheels began to turn," *Rock Solid* 260, after the officers called everyone they knew does not support an inference that the judge involved herself in the investigation.

Lopez cites no evidence in the transcript or elsewhere in the record that conceivably substantiates his allegations of judicial bias or disqualifying *ex parte* contacts, and the precedents he cites in support of this claim involved serious misconduct that had been established by the evidence, not unjustified speculation based on ambiguous quotations taken from a "true crime" book of questionable accuracy. *See, e.g., Bracy v. Gramley,* 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997) (judge who convicted defendant subsequently himself convicted of bribery); *Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 327, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979) (judicial officer ruling on search warrant was the "member, if not the leader, of the search party"). His claim of judicial misconduct amounting to a

denial of due process is completely devoid of merit.

### CONCLUSION

For the reasons stated, Lopez's petition for a writ of habeas corpus is denied. A certificate of appealability will issue, limited to petitioner's claim that he received ineffective assistance of counsel because of trial counsel's failure to investigate and consider filing a motion to suppress the fruits of the search warrant. As to no other issue has petitioner made a substantial showing of the denial of a constitutional right; accordingly, a certificate of appealability is denied as to all other issues. *See* 28 U.S.C. § 2253(c)(2).

SO ORDERED.